Samuel W. KOSTER

v.

The UNITED STATES.

No. 65–77.

United States Court of Claims.

July 28, 1982.

408

Neil B. Kabatchnick, Washington, D. C., for plaintiff.

Colvin W. Grannum, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Major Michael J. Nardotti, Jr., Office of the Judge Advocate Gen. U. S. Army, Washington, D. C., of counsel.

Before SKELTON, Senior Judge, and NICHOLS and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This case concerns certain administrative sanctions imposed on plaintiff, commander of the 23d Infantry (Americal) Division of the United States Army in Vietnam in 1967 and 1968, after his alleged failure to conduct a prompt and proper investigation into the actions of certain elements of that Division on March 16, 1968, at Son My Village, Vietnam, and in one of its constituent hamlets, My Lai (4). Plaintiff is presently before the court contesting a determination, dated March 12, 1980, by the Army Board for Correction of Military Records (ABCMR) to uphold those sanctions. The case has been briefed extensively by able counsel, we have heard oral argument on the cross-motions for summary judgment and we have noted the full administrative record, which runs into many thousands of pages. In its long prior history, this case has seen the involvement of five highly ranked Army generals, several special boards of inquiry, three different Secretaries of the Army and a congressional hearing. Upon careful consideration of all of this, after close examination of those parts of plaintiff's case that are within our jurisdiction, we are not able to conclude that the decision of the ABCMR should be overturned.

Plaintiff is an illustrious member of the military, retired since November 30, 1973, in the permanent rank of brigadier general

(RA).[1] That rank had been held from November 22, 1968, achieved by plaintiff after 26 years of distinguished service following his graduation from the United States Military Academy at West Point in 1942. Those years included significant wartime experience—in World War II as a company commander, a battalion commander and a regimental executive officer; in Korea as operational training staff officer at the Eighth Army headquarters and as commanding officer of the Eighth Army guerrilla warfare unit; and in Vietnam as commanding general of Task Force Oregon (the predecessor of the Americal Division)—and significant peacetime experience—as an instructor at West Point and in various positions at Fort Benning, Georgia, in the Pacific and at Washington, D. C. Plaintiff also held for a time, in addition to his regular rank, the temporary rank of major general (AUS) and it was during the time of holding that rank that plaintiff commanded the Americal Division in combat operations in Vietnam, a difficult assignment because of the conglomerate make-up of the Division and its very large area of operations. After returning from Vietnam, still while a temporary major general, plaintiff also had the distinction of serving as Superintendent of the United States Military Academy at West Point, New York.

## I

Plaintiff's case is part of the aftermath of the incident at the hamlet of My Lai, a black mark on the otherwise distinguished record of the United States Army in Vietnam, when on March 16, 1968, a company or a platoon of United States troops engaged in widespread and indiscriminate crimes including the killing of unarmed Vietnamese civilians. Plaintiff's part in the matter concerns only the fact that the full story of the events of that day did not become known until more than a year after the crimes took place. Without now getting into a full recounting of what happened, it has gener-

ally been established that plaintiff, in his role as commander, came to know of at least four irregularities that allegedly should have spurred him to call for a full investigation and for a report of the results to be made to higher authority as regulations required. Three matters came to him on March 16, 1968, or shortly thereafter: (1) there were unusual figures for the day in that 128 of the enemy were reported killed in action yet there were only two U. S. soldiers killed, 11 wounded and only 3 weapons were captured; (2) there was a report of 20 civilian deaths from U. S. artillery fire, an unusually large number; and (3) plaintiff received personally a watered-down version of the report by a U. S. helicopter pilot who tried to stop the killing at My Lai (4). Also, plaintiff learned a month later that (4) there was a Viet Cong propaganda leaflet that charged that U. S. troops had massacred some 500 civilians in and around Son My Village in mid-March.

Plaintiff did initiate inquiries, but, through various circumstances including what may have been a cover-up by some subordinate officers, the full, true story did not emerge. It was not until much later that the incident began to become widely known and special investigatory bodies were formed. Court-martial charges were brought against plaintiff on March 12, 1970, under the Uniform Code of Military Justice, Article 92, 10 U.S.C. § 892 (failure to obey orders and regulations and dereliction of duty). These charges were dismissed on January 28, 1971, in favor of the imposition of certain administrative sanctions. It is these sanctions that underlie plaintiff's present complaints.

On May 18, 1971, on the recommendation of Chief of Staff General Westmoreland and the Army Staff, and after a written notice of the charges and submission by plaintiff of a full rebuttal, orally and in writing, with the aid of counsel, Secretary of the Army Resor determined: (1) that

---

1. The Regular Army (RA) is one of the component parts of the Army of the United States (AUS). By statute, an officer in the RA may hold, in addition to his permanent grade, a temporary appointment in the AUS at a grade equal to or higher than his regular grade. 10 U.S.C. § 3442 (1976).

plaintiff's appointment as a temporary major general should be vacated; (2) that a Letter of Censure should be placed in plaintiff's military personnel file; and (3) that the Distinguished Service Medal awarded to plaintiff for his service during the period should be withdrawn. In a memorandum of explanation to the Secretary of Defense, Secretary Resor made clear that plaintiff was not being held responsible for the acts committed or even for the subsequent cover-up. Plaintiff was criticized only for failing to investigate properly, on evidence that Secretary Resor and the Army Staff considered sufficient to have warranted a full investigation. As the memorandum states:

> In my view General Koster, although free of personal culpability with respect to the murders themselves, is personally responsible for the inadequacy of subsequent investigations, despite whatever other failures may have been ascribed to his subordinates.

> \*    \*    \*    \*    \*    \*

> A commander is not, of course, personally responsible for all criminal acts of his subordinates. In reviewing General Koster's case, I have also excluded as a basis for administrative action the isolated acts or omissions of subordinates. But a commander clearly must be held responsible for those matters which he knows to be of serious import, and with respect to which he assumes personal charge. Any other conclusion would render essentially meaningless and unenforceable the concepts of great command responsibility accompanying senior positions of authority.

The three sanctions listed above were implemented on May 19, 1971.

Plaintiff also complains of harm that he alleges has flowed from these three sanctions and from the stigma of his involvement in the My Lai affair. Four times, from 1969 to 1972, plaintiff was passed over for selection to the permanent grade of major general, allegedly because of certain objectionable material in Officer Efficiency Reports (OERs) for the periods from June 3, 1969 to March 22, 1970, and from March 23, 1970 to July 29, 1971. As a result, plaintiff was mandatorily retired from the Army on November 30, 1973, for having remained 5 years in the grade of brigadier general without promotion. 10 U.S.C. § 3922 (1976).[2] Also, plaintiff was denied retirement pay in the grade of major general, which plaintiff claimed pursuant to a statutory entitlement for a retired regular officer to receive "a retired grade equal to the highest temporary grade in the Army in which he served on active duty satisfactorily, as determined by the Secretary of the Army, for not less than six months." 10 U.S.C. § 3963 (1976). Secretary of the Army Callaway refused to find satisfactory performance when plaintiff's service at that grade was taken as a whole, including the time period covering My Lai. Thus, plaintiff alleges a claim for improper retirement and a claim for retirement at an improper grade in addition to his claims for the reversal of the sanctions imposed by Secretary Resor.

In November 1972 plaintiff appealed Secretary Resor's sanctions to Resor's successor, Secretary of the Army Froehlke. This appeal was denied on March 7, 1973. On July 24, 1973, plaintiff appealed to Froehlke's successor, Secretary of the Army Callaway, who also considered plaintiff's claim to be retired at the grade of major general. Secretary Callaway upheld the sanctions on November 29, 1973, and, as outlined above, declined to permit retirement at the higher grade. On January 20, 1974, plaintiff filed with the ABCMR essentially the same claims as he presses now.[3]

---

**2.** The section provides, in pertinent part: "Unless retired or separated at an earlier date, each officer in the regular grade of brigadier general \* \* \* shall be retired \* \* \* on the fifth anniversary of the date of his appointment in that regular grade, or on the thirtieth day after he completes 30 years of service \* \* \* whichever is later."

**3.** In deference to the limits on the jurisdiction of the court to appoint and to promote, plaintiff does not now request correction of his records to show that he was selected for the permanent grade of major general.

On January 27, 1977, plaintiff filed a petition in this court, presumably to avoid the running of the statute of limitations, and filed a concurrent motion to suspend proceedings pending the ABCMR's adjudication. On March 30, 1979, over 5 years after petitioning the ABCMR, plaintiff's 415-page brief and 75 exhibits were filed there. On March 12, 1980, the ABCMR, in an extensive memorandum of consideration, reviewed the case and denied plaintiff the relief he sought. Upon consideration of all of the evidence, the ABCMR concluded that plaintiff's overall performance justified the Letter of Censure, and that the actions taken by the Secretary of the Army to terminate his temporary appointment as major general, to withdraw his award of the DSM, and to authorize his retirement in the grade of brigadier general were also justified on the record of evidence and were not arbitrary or capricious but were authorized within the discretional judgment accorded the Secretary under law. The board also concluded that there was no sound basis to promote plaintiff to the permanent grade of major general or to retire him at that grade. The board's ultimate determination was that: "The applicant has failed to submit sufficient relevant evidence to demonstrate the existence of probable material error or injustice to warrant a formal hearing."

## II

Plaintiff now petitions: (1) for the reversal of the vacation of his temporary appointment to major general; (2) for a voiding of his passovers for selection to permanent major general; (3) active duty back pay in the grade of major general from May 19, 1971 to November 30, 1973, and retired pay at that grade from December 1, 1973 to date of judgment and placement on the retired list as a major general; (4) for the removal of the Letter of Censure in his file; and (5) for the restoration of his Distinguished Service Medal.

■ Procedurally, this court's review power generally is limited to ensuring that the ABCMR's decisions are not arbitrary, capricious, unsupported by substantial evidence, in bad faith or contrary to law or regulation. *Clayton v. United States*, Ct.Cl. No. 340–79C (order entered September 19, 1980); *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979). *See Hodges v. Callaway*, 499 F.2d 417 (5th Cir. 1974). Plaintiff alleges that all actions taken against him violated the foregoing tests of fairness and legality. Defendant argues that plaintiff's claims are barred by laches, are insubstantial, are beyond the jurisdiction of the court or that plaintiff has not stated claims on which relief can be granted.

■ We note first that plaintiff has not alleged that his claims concerning the Letter of Censure and the revocation of his Distinguished Service Medal involve any money. In the military pay area, this court has jurisdiction only over money claims, so these two aspects of plaintiff's case cannot be resolved here even though they may properly have been before the ABCMR. *Sanders; see Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967). We must be careful to observe the limitations on our jurisdiction. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). Plaintiff's other three claims, however, do colorably involve money: the vacation of plaintiff's temporary appointment to major general brought a reduction in salary; his nonselection for major general and his subsequent mandatory retirement after 5 years as brigadier general cut off plaintiff's active duty pay; and his retirement as brigadier general instead of major general has meant a lower level of retirement pay. These claims, and our jurisdiction over them, are discussed separately.

### A. *The vacation of the temporary grade.*

Under 10 U.S.C. § 3447(c) (1976), the President "may vacate at any time a temporary appointment in a commissioned grade." There are no applicable regulations or directives to limit the exercise of discretion in this regard.

Defendant argues that the absence of any restraints on the power of vacation must mean that this court has no jurisdiction to review such vacations. Its position is that if a decision is committed wholly to the discretion of an executive official, this court should not be able to substitute its own orders. Defendant further points out that it has long been understood that judicial interference with internal administration of the military is particularly inappropriate, given the vital mission of the armed forces, the special expertise and abilities that their proper running requires and the lack of such competence or responsibility in the judiciary. *Rostker v. Goldberg*, 453 U.S. 57, 65, 71, 101 S.Ct. 2646, 2654, 69 L.Ed.2d 478 (1981). *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). *See also Keim v. United States*, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1900).

▪ Courts, however, have permissibly looked into validity of, or violation of, agency regulations, *Sampson v. Murray*, 415 U.S. 61, 71, 94 S.Ct. 937, 943, 39 L.Ed.2d 166 (1974), and even into discretionary military affairs on occasion. We think it is sufficient in this case that plaintiff has alleged that defendant engaged in due process violations. Where, as here, there is no problem of sovereign immunity,[4] executive discretion must be subject at least to constitutional review. *See Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971).

▪ Plaintiff alleges that Secretary Resor's decision-making violated due process in that he considered several *ex parte* communications, documents that were not contemporaneously furnished to plaintiff. In particular, plaintiff complains of: (1) volume 1 of the report of the Peers-MacCrate Inquiry, the first intensive investigation into My Lai; (2) a report entitled "Leadership Requirements In A Counterinsurgency Environment" prepared by Lieutenant General Peers for General Westmoreland, Army Chief of Staff; and (3) the summary sheet for a memorandum of law on administrative sanctions prepared for the Secretary by the Office of the Judge Advocate General.

None of these communications, however, is of the type of *ex parte* communication that offends due process. In *Camero v. United States*, 179 Ct.Cl. 520, 375 F.2d 777 (1967), this court made clear that it is impermissible in (1) adversarial proceedings for (2) one of the adversaries privately to communicate with the decision-maker regarding the decision. "[O]ne of the fundamental premises inherent in the concept of an adversary hearing * * * is that neither adversary be permitted to engage in an *ex parte* communication concerning the merits of the case with those responsible for the decision." *Id.* at 527, 375 F.2d at 780. We did not say, and do not believe, that investigatory reports, advisory opinions or staff memoranda are offensive if not prepared by, nor emanating from, one of the adversaries. Such communications merely are part of the way in which a decision-maker gathers information.[5] Further, we did not say that the *ex parte* rule has any application where the proceedings are not adversarial at all.

In the situation before us, plaintiff has made no showing that Secretary Resor's deliberations on the imposition of sanctions were, or should have been, adversarial in nature, and so we must hold that plaintiff's complaint of *ex parte* communications is inapposite. Moreover, we note that none of the originators of the communications under consideration ever functioned in a role that was adversarial to plaintiff. Therefore, Secretary Resor engaged in no due process violation.

---

4. 37 U.S.C. § 204 (1976) entitles an officer to the pay of his rank until properly separated. *See Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979).

5. *Cf. Ralpho v. Bell*, 569 F.2d 607 (D.C.Cir. 1977) (where agency decided an entitlement, it violated due process not to furnish claimant with a factual compilation that served as the primary decisional document); *see also Della Valle v. United States*, Ct.Cl. No. 300–80C (order entered July 16, 1982).

With regard to *ex parte* communications in general, plaintiff also complains of two documents considered by the ABCMR: (1) an advisory opinion by the Office of the Judge Advocate General and (2) the memorandum of consideration by a staff examiner of the ABCMR to the board members. These, too, however, are not communications that offend due process. Plaintiff's adversary, if any, was the General Counsel and not the Judge Advocate General nor a board staffer. The ABCMR's consideration of the two documents was legally correct. *Borgford v. United States*, 618 F.2d 124 (1979); *Flute v. United States*, 210 Ct.Cl. 34, 535 F.2d 624 (1976). Plaintiff had no property right in his temporary rank but we believe he was nevertheless accorded full due process concerning its termination.

B. *The passovers and the subsequent retirement.*

▇ Plaintiff claims that he was passed over for promotion to major general due to objectionable material in several OERs. Although plaintiff's resulting mandatory retirement seems to generate a money claim, a closer look shows that it actually does not.

Plaintiff was retired for reaching the statutory limit of 5 years of service at the rank of brigadier general. Even if this court were to void one of the passovers that occurred during that time, we could not reinstate him, because he has served the 5-year limit, nor could we carry out a promotion. *Browne v. United States*, Ct.Cl., 618 F.2d 123 (1979); *Savio v. United States*, 213 Ct.Cl. 737 (1977); *Doggett v. United States*, 207 Ct.Cl. 478 (1975). Thus, the fullest relief that this court could afford would only be to entitle plaintiff to a "re-look" on corrected material. Such relief would not bring money with it, and so we must conclude that our jurisdiction does not extend to this element of the plaintiff's claim. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

We note that this case is not like our cases that have found jurisdiction when a serviceman has been mandatorily terminated after two passovers. *See, e.g., Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979). In those cases, the voiding of a passover vitiates the ground on which termination was forced, allowing reinstatement and a resultant money claim for lost active pay. Here, however, plaintiff has served his 5 years, and voiding a passover would not change that.

C. *The retirement at brigadier general.*

Plaintiff was retired as a brigadier general because the Secretary of the Army refused to make a determination that plaintiff's service in the rank of temporary major general was satisfactory when such service was considered as a whole. Although a claim for money again seems to be involved, this is another instance where the fullest relief still would not bring the monetary entitlement that is our jurisdictional predicate.

▇ The determination of satisfactory performance is committed by statute to the Secretary. 10 U.S.C. § 3963 (1976). Thus, even if this court were to determine that the Secretary's decision is reviewable, for example for a constitutional violation, *see Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), this court could not affirmatively re-make it as plaintiff asks us to do. Nor will the court substitute its own judgment where the administrative decision is supported by substantial evidence. *See Randolph v. United States*, 179 Ct.Cl. 425 (1967); *Brownfield v. United States*, 148 Ct.Cl. 411 (1960).[6] A remand to an agency to make a determination that this court is not competent to make, without any immediate entitlement to money, is just the type of decision that was held to be beyond the power of the court in *Testan*. Accordingly, we must hold that this claim of plaintiff is not one that we can decide.

---

**6.** Plaintiff relies on these two cases in which this court ruled on the merits of cases similar to the one now before us. In those cases, however, jurisdiction was not argued to the court, and the opinions do not address it.

Plaintiff also brings a collateral attack on the decision of the ABCMR, citing this court's decision in *Werner v. United States*, 226 Ct.Cl. ——, 642 F.2d 404 (1981), and alleging (1) that the ABCMR improperly delegated its deliberative responsibilities to a staff examiner and (2) that its decision was not based on a balanced consideration of all the relevant evidence. Our review of the ABCMR's decision, however, shows that the board itself engaged in a fully adequate consideration of the extensive materials before it. The board's decision may not specifically address every allegation raised, but it does not need to. The decision covers everything of legal significance. Moreover, it is not objectionable that a staff examiner assisted the board members in their consideration of the case. In the absence of a clear showing to the contrary, as there was in *Werner*, such assistance is presumed to be merely that, assistance to the members in *their* reaching of the final decision. *See Shull v. United States*, Ct.Cl. Nos. 16–, 332–, 333–, 352–, 356–, and 409–78 (order entered July 10, 1981); *Reid v. United States*, Ct.Cl., 618 F.2d 123 (1979); *Boyle v. United States*, 207 Ct.Cl. 27, 515 F.2d 1397 (1975).

We are sensitive to plaintiff's assertion, at times implicit and at times explicit, that he has been made to suffer for the political and public pressures that were brought to bear on the Army as a result of the My Lai incident. We turn back to the memorandum of explanation by Secretary Resor to the Secretary of Defense, dated March 23, 1971, stating in part:

> There is no single area of administration of the Army in which strict concepts of command liability need more to be enforced than with respect to vigorous investigations of alleged misconduct. * * General Koster may not have deliberately allowed an inadequate investigation to occur, but he did let it happen, and he had ample resources to prevent it from happening.
>
> The test of commanders, especially those in the field in times of actual hostilities, has always been strict. Too much is at stake for it to be otherwise. General Koster must be measured by that test. General Seaman, the convening authority who dismissed the criminal charges, found General Koster's performance substandard. The views of General Westmoreland, supported by those of Generals Palmer, Kerwin and Hodson reflect a similar conclusion. * * *
>
> Doubtless there will be some, including military officers, who feel that General Koster is being treated harshly, or is being made a scapegoat. It is difficult to combat uninformed judgments on a matter requiring a painstaking assessment of a voluminous, complex record, as is the case here. * * * I believe that, to the extent we cannot bring all sectors of the public to acceptance of our action, we must abide the resulting criticism. The job of maintaining necessary standards of responsibility of senior officials is too important to the Army and to the nation to be significantly influenced by the criticism of those who are inadequately informed.

On review of the materials before us, we cannot say differently. Our conclusion makes it unnecessary to reach other issues raised by the parties.

Defendant's motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. The petition is dismissed.