**James M. WOODWARD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 86–1283.**

United States Court of Appeals, Federal Circuit.

March 29, 1989.
Rehearing Denied May 2, 1989.
Suggestion for Rehearing In Banc Declined May 12, 1989.

Department of the Navy (Navy) to release him from active duty. We affirm that judgment, but on other grounds.

Daniel M. Schember, of Gaffney, Anspach, Schember, Klimaski & Marks, Washington, D.C., argued for appellant.

John S. Groat, of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and M. Susan Burnett, Asst. Director. Of counsel was Lt. Col. Keith Sefton, of the Dept. of the Navy, Office of the Judge Advocate General, Alexandria, Va.

Before FRIEDMAN, SMITH and ARCHER, Circuit Judges.

ARCHER, Circuit Judge.

Appellant James M. Woodward appeals the summary judgment of the United States Claims Court, No. 692–83C (March 31, 1986), upholding the decision of the

*Background*

Woodward enlisted in the U.S. Naval Reserve in June 1972. At that time, he completed a fitness questionnaire in which he indicated, according to the trial court, that "he was attracted sexually to, or desired sexual activity with, members of his own sex [but that he had never] engaged in homosexual conduct." Despite this acknowledgment,[1] Woodward was accepted into Navy flight school in June 1972.

After completing flight school, Woodward was assigned to Carrier Airborne Early Warning Squadron 116, a fleet operational squadron assigned to the Philippines. While stationed there in 1974, Woodward visited the Subic Bay Officers' Club in the company of an enlisted man who was awaiting discharge from the Navy because of homosexuality. Woodward's commanding officer subsequently questioned him about the incident, at which time Woodward "admitted his homosexual tendencies and stated that since he knew no 'gay' officers he had sought the company of 'gay' enlisted men." The commanding officer then asked Woodward to resign. When Woodward refused, the commanding officer wrote to the Chief of Naval Personnel recommending that Woodward be discharged.

Woodward informed the Chief of Naval Personnel in a September 17, 1974 letter via his commanding officer that:

> I am, and have been, since I became sexually aware, primarily homosexually oriented.... I do, and will continue to, associate with other homosexuals.
>
> \* \* \* \* \* \*
>
> I am well aware of the problems of social acceptance and special problems of leadership with which I will be confronted as

---

1. The Navy's stated policy at that time was to separate homosexuals and "[m]embers involved in homosexuality" from the service, *see, e.g.,* Secretary of the Navy Instruction 1900.9A (July 31, 1972) (SECNAVINST 1900.9A). "Homosexuality" was defined as including "the expressed desire, tendency, or proclivity toward [homosexual] acts whether or not such acts are committed." *Id.* It was conceded, however, that while this regulation provided for no exceptions, the Navy did retain some officers with homosexual tendencies.

my associates become aware of my homosexuality.

\* \* \* \* \* \*

For the good of both the Navy and myself, I respectfully request the chance to contribute to the defense of the United States as an honest, open, "gay" officer. I recommend that the matter of my homosexuality be dropped as a matter of official concern.

The recommended discharge was not processed and, pursuant to routine Navy practice when a commanding officer's discharge recommendation is not accepted, Woodward was made available for reassignment or release from active duty. Woodward's file was then reviewed by a personnel officer in the office of the Chief of Naval Personnel responsible for grading an individual's performance records and recommending whether the Navy should reassign or release the individual. According to the officer who reviewed Woodward's file and other officers with review responsibilities, fitness reports comparable to Woodward's reports usually received grades of "C" or "D" and reserve officers who received such grades were released from active duty. A grade of "A" or "B" was generally required for retention on active duty. The record shows that the Navy ranked Woodward below the cutoff point for retaining a reservist for the following reasons: Woodward had acknowledged his homosexuality; his fitness reports, which were prepared by Woodward's commanding officer prior to Woodward's admission of homosexuality, were "far from outstanding," leaving him uncompetitive with other reserve officers available for reassignment or release; and his release would appropriately implement the Navy policy (at that time) of reducing the number of reserve officers on active duty.

Woodward was released from active duty on October 22, 1974 and reassigned to the Naval Air Reserve Staff H–1 in San Diego, California. He served there without pay in an inactive reserve status and received a promotion to Lieutenant, junior grade. Later, at his request, the Navy released him from further reserve status. During this period Woodward was passed over twice for a further promotion and the Navy thereafter discharged him when his six-year term of service had been completed.

## TRIAL COURT DECISION

Woodward initially brought this action in the United States District Court for the District of Columbia seeking back pay and reinstatement to active duty in the U.S. Naval Reserve. He alleged in part that his release from active status was in violation of his constitutional rights of due process and freedom of association. After prolonged proceedings, including two appeals, it was ascertained that the district court lacked jurisdiction under 28 U.S.C. § 1346 (1982) because Woodward's pay claim exceeded $10,000. *See Woodward v. Moore*, 451 F.Supp. 346 (D.D.C.1978); *Woodward v. Moore*, No. 78–2062 (D.C.Cir. March 26, 1979); *Woodward v. Moore*, 25 Fair Emp. Prac.Cas. (BNA) 695 (D.D.C.1981), *vacated*, *Woodward v. Moore*, 684 F.2d 1033 (D.C. Cir.1982). This case was then transferred to the Claims Court.

Before the Claims Court, Woodward asserted that the Navy improperly and unconstitutionally released him from active duty because of admitted homosexual tendencies. He contended that his release violated the First and Fifth Amendments of the United States Constitution. The Navy challenged these contentions, arguing that Woodward's release was based on his record and his performance and, further, that the court lacked jurisdiction to review the Navy's action because of the discretion conferred on the Secretary of the Navy by 10 U.S.C. § 681(a) (1982) (providing that the Secretary may release a reservist from active duty at any time). Both parties moved for summary judgment.

The Claims Court recognized that the Secretary was vested with wide discretion to release a reservist from active duty. The Claims Court determined, however, that it could review such a personnel action for violation of regulations and for violation of constitutional rights where such violations would give rise to monetary claims. The Claims Court then assumed

that Woodward's conduct was constitutionally protected and reviewed Woodward's release, under the guidelines of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). It found that the Navy had met its burden of showing by a preponderance of the evidence that the Navy would have reached the same decision as to Woodward's release, without regard to the conduct claimed to be constitutionally protected, because his performance was below the level necessary to be retained on active duty.

## ANALYSIS

### I

On appeal, Woodward contends that the Claims Court erred in its application of *Mt. Healthy City School District Board of Education v. Doyle* to this case by finding the Navy had proved an independent basis for his release. He further contends that release from active duty violated his constitutional rights to privacy and to equal protection under the laws.[2]

The Navy, on the other hand, asserts that the commanding officer's recommendation to discharge Woodward, the Navy's subsequent review of Woodward's record for potential transfer or release, and the decision to release Woodward from active duty are all immune from judicial review. The Navy further contends that homosexuality is not constitutionally protected conduct and, even if such conduct is constitu-

tionally protected, that the Navy met its burden of proving an independent basis for deciding to release Woodward.

### II

We consider first the Navy's assertion that the commanding officer's recommendation that Woodward be discharged, the review for transfer or release, and the Navy's subsequent decision to release him from active duty are not judicially reviewable.

■ The statutory authority given to the Secretary of the Navy to release a reserve officer from active duty is not subject to any procedural or substantive limitation. It is contained in 10 U.S.C. § 681(a) (1982) and provides that "the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty." The applicable Navy instruction preserves the discretion granted by that section and does not provide an independent source of procedural or substantive protection.[3] *See Webster v. Doe,* — U.S. ——, 108 S.Ct. 2047, 2053 n. 8, 100 L.Ed.2d 632 (1988), *aff'g Doe v. Casey,* 796 F.2d 1508, 1520 (D.C.Cir. 1986). *Cf. Sampson v. Murray,* 415 U.S. 61, 71, 94 S.Ct. 937, 944, 39 L.Ed.2d 166 (1974) (federal courts have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed its administrative regulations). Secretary of the Navy Instruction 1920.6 (July 14, 1971) (SECNAVINST 1920.6), setting forth "procedures, regulations, and instructions for

---

**2.** Woodward does not seriously contend on appeal that his statements are entitled to First Amendment protection. Because Woodward's statements were made "for personal reasons and not to inform the public of matters of general concern" they are not entitled to First Amendment protection. *Fiorillo v. United States Dep't of Justice,* 795 F.2d 1544, 1550 (Fed.Cir. 1986). "Mere publication does not clothe them with First Amendment protection." *Id.; Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). The First Amendment protection to the advocacy of homosexuality discussed in *Matthews v. Marsh,* No. 82–0216 P, slip op. at 20 n. 18 (D.Me. April 3, 1984), *vacated and remanded,* 755 F.2d 182 (1st Cir.1985) ("'her overt on-campus involvement in the Wild [sic] Stein Club for "gays and lesbians'"... confirms the conclusion that it is

impossible to separate the issue of Matthews' self-identification from a First Amendment claim" (citation to exhibit omitted)) is inapplicable to the instant case.

**3.** Woodward's contention that he was not afforded the benefit of the Navy's admitted practice of retaining some homosexuals while discharging others is without merit. Woodward was not discharged for homosexuality; rather he was considered for reassignment, but because of his mediocre record as an officer *and* his homosexuality he was ultimately released from active duty pursuant to 10 U.S.C. § 681. Consequently, there is no inconsistency between Woodward's treatment and the Navy's practice of considering some homosexuals for retention.

implementation of statutes which provide for the separation of officers from the Navy and Marine Corps, termination of appointments, revocation of commission and/or discharge, release from active duty," provides as to reserve officers:

c. Reserve Officers

....

(3) Release from Active Duty. In the case of Reserve officers of the Navy and Marine Corps, the Chief of Naval Personnel or the Commandant of the Marine Corps, respectively, may at any time, for any reason, release a Reserve officer from active duty....

SECNAVINST 1920.6, ¶ 6(c)(3).

The Navy relies on *Denby v. Berry*, 263 U.S. 29, 44 S.Ct. 74, 68 L.Ed. 148 (1923), to support its position that Woodward's release from active duty was not subject to judicial review. There, the Court explained that a statute and regulation requiring a hearing before a Navy Retiring Board before an officer could be *retired* did not limit the discretion of the President and the Secretary of the Navy to release individuals from active service and put them on inactive duty. It said:

> Nowhere is there found any limitation upon the discretion of the Executive in this regard. The orders in such cases were in the nature of military orders by the Commander-in-Chief in the assignment or withdrawal of available forces to or from duty for the good of the service. Such orders of withdrawal could not and did not make members of the Naval Reserve Force civilians. They did not release them from obligation under their enrollment to render active service again when ordered to do so by the proper authority.

263 U.S. at 34, 44 S.Ct. at 76.

The Navy also cites *Alberico v. United States*, 783 F.2d 1024 (Fed.Cir.1986), where we similarly held that Alberico's release from active duty did not deprive him of due process and that his "interest in remaining on active duty was a mere expectancy, and

therefore not entitled to protection as a property right." 783 F.2d at 1027. Moreover, *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953), cautions that "judges are not given the task of running the [military].... The military constitutes a specialized community governed by a separate discipline from that of the civilian." The judiciary therefore must be "scrupulous not to interfere with legitimate [military] matters...." *Id.* at 94, 73 S.Ct. at 540.

While the statute and cited authorities indicate that the Secretary's discretion is generally unfettered, employment actions claimed to be based on constitutionally infirm grounds are nevertheless subject to judicial review. The Supreme Court's decision in *Webster v. Doe*, — U.S. —, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), demonstrates that the delegation of broad discretion in employment matters on an agency head does not preclude judicial review of constitutional claims unless congressional intent to do so is made clear.[4] *Webster* concerned reviewability under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1982), of the decision of the Director of the Central Intelligence Agency (CIA) to terminate "an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' ... not simply when the dismissal *is* necessary or advisable to those interests." 108 S.Ct. at 2053 (emphasis by the Court). Such language, according to the Court, "strongly suggests that its implementation was 'committed to agency discretion by law'" under section 701(a) of the APA. *Id.* The Court determined, however, that Congress' grant of discretionary authority to the Director was not "meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section." *Id.* at 2054. It rejected the Director's position that "all Agency employment termination decisions, even those based on policies normally repugnant

---

4. The Court explained that it requires "this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." 108 S.Ct. at 2053.

to the Constitution, are given over to the absolute discretion of the Director, and are hence unreviewable under the APA." *Id.*

■ Although *Webster* involved equitable remedies under the APA, the same principles are applicable to pay claims under the Tucker Act in the Claims Court. *Koster v. United States*, 685 F.2d 407, 412, 231 Ct.Cl. 301 (1982) ("Where ... there is no problem of sovereign immunity, executive discretion must be subject at least to constitutional review." (footnote omitted)); *cf. Voge v. United States*, 844 F.2d 776, 781 n. 2 (Fed.Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). Accordingly, the Claims Court was correct in holding that it had jurisdiction in a claim for money damages to consider Woodward's allegation of violations of constitutional rights. *Koster v. United States*, 685 F.2d at 412; *Padula v. Webster*, 822 F.2d 97, 101 (D.C.Cir.1987) ("even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated").

### III

Woodward challenges the Claims Court's decision on the basis that the Navy failed to establish a defense under *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), because the Navy did not show by a preponderance of the evidence that Woodward would have been released from active duty in the absence of his admission of homosexuality. The Supreme Court in *Mt. Healthy* stated that "[t]he constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct." *Id.* at 285–86, 97 S.Ct. at 575. The evidentiary burden of the Navy, assuming (as the Claims Court did) that homosexuality is protected conduct, was to prove that it would have taken the same actions "even in the absence of the protect-

ed conduct." *Id.* at 287, 97 S.Ct. at 576. *See Brown v. Bullard Indep. School Dist.,* 640 F.2d 651, 653 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). The Claims Court in its opinion stated that:

> The [Navy] has introduced credible evidence by personnel officers who regularly review files that even without consideration of Woodward's homosexual tendencies, he would have been recommended for release *at the time his record was reviewed.* In other words, a Navy Ensign with a similar record to [Woodward's] would have been released *if his file had reached the reviewing office* at the same time Woodward's file did. (Emphasis added.)

The court's reasoning, however, fails to take into account that Woodward's file would not have reached the reviewing office at all had he not been homosexual and admitted it to his commanding officer. The Navy's statistical information presented by Woodward shows there were no other reserve officers in Woodward's grade and category (132X)[5] who were released in 1975, or in the prior or following years. The reason for this, according to the testimony of Woodward's reviewing officer, was that "ensigns were not normally made available for rotation." Thus, the other 130 officers in Woodward's category who were released in 1975 all were of the grade of Lieutenant J.G. or above and none were ensigns. There was also evidence before the court that Woodward's ranking by his commanding officer (before his verbal acknowledgment of homosexuality) would place him between the 50th and 60th percentile vis-a-vis his contemporaries, indicating that the files of a large number of ensigns with lower ranking never reached the reviewing office in 1975.

■ Under these circumstances, the testimony of the Navy reviewing officers that an officer having the same ranking as Woodward would have been released had his file been reviewed does not establish a *Mt. Healthy* defense. The facts are clear

---

**5.** Four other ensigns were released in 1975 but they were Student Naval Flight Officers (137X).

that ensigns with low rankings were not referred to the reviewing office for reassignment or release. Only because of his homosexuality was Woodward referred for review and it was, in part, the basis for his release from active duty.

## IV

Woodward contends that because homosexuality is protected under the constitutional right to privacy, the Secretary may not, consistent with the due process clause of the Fifth Amendment, use Woodward's admitted homosexuality as a criterion for referring him for review or as a basis for his release from active duty.[6] Because the Supreme Court held in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed. 2d 140 (1986), that homosexual conduct is not one of the fundamental rights subject to heightened review under the due process clause, we cannot agree with Woodward.

In *Hardwick*, the Court recognized that the due process clauses of the Fifth and Fourteenth Amendments "have been interpreted to have substantive content, subsuming rights that to a great extent are immune from federal or state regulation or proscription." *Id.* at 191, 106 S.Ct. at 2844. The Court noted that "rights qualifying for heightened judicial protection ... include[ ] those fundamental liberties that are 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [they] were sacrificed,'" *id.* at 191–92, 106 S.Ct. at 2844 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)), or, described otherwise, "are ... those liberties that are

'deeply rooted in this Nation's history and tradition.' " *Id.* at 192, 106 S.Ct. at 2844 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (opinion of Powell, J.)).

In its opinion in *Hardwick*, the Supreme Court reiterated that the right of privacy concerned matters of the family, marriage and/or procreation.

The reach of this line of cases was sketched in *Carey v. Population Services International*, 431 U.S. 678, 685 [97 S.Ct. 2010, 2016, 52 L.Ed.2d 675] (1977). *Pierce v. Society of Sisters*, 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070] (1925), and *Meyer v. Nebraska*, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042] (1923), were described as dealing with child rearing and education; *Prince v. Massachusetts*, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645] (1944), with family relationships; *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 [62 S.Ct. 1110, 86 L.Ed. 1655] (1942), with procreation; *Loving v. Virginia*, 388 U.S. 1 [87 S.Ct. 1817, 18 L.Ed.2d 1010] (1967), with marriage; *Griswold v. Connecticut*, [381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)], and *Eisenstadt v. Baird*, [405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)], with contraception; and *Roe v. Wade*, 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973), with abortion. The latter three cases were interpreted as construing the Due Process Clause of the Fourteenth Amendment to confer a fundamental individual right to decide whether or not to beget or bear a child. *Carey v.*

---

**6.** In describing himself, Woodward at various times stated that "he was attracted sexually to, or desired sexual activity with, members of his own sex," that "since he knew no 'gay' officers he sought the company of 'gay' enlisted men," that he "[does], and will continue to, associate with other homosexuals," and that he wanted to remain in the Navy "as an honest, open, 'gay' officer." Also, Woodward visited an Officers' Club with an enlisted man who was awaiting discharge from the Navy for homosexuality. There is no claim by Woodward that he is celibate. Nevertheless, Woodward's counsel, in his briefs, attempted to characterize Woodward as having only homosexual tendencies. While acts of sodomy have not been expressly admit-

ted by Woodward, in view of the above we need not address the factual situation where there is action based *solely* on "status as a person with a homosexual orientation." *benShalom v. Marsh*, 703 F.Supp. 1372, 1373 (E.D.Wis.1989) (no proof she "had engaged in homosexual acts or had done anything that could be interpreted as a homosexual advance toward another female soldier"). *See also benShalom v. Secretary of Army*, 489 F.Supp. 964 (E.D.Wis.1980). *Cf. Watkins v. United States Army*, 847 F.2d 1329 (9th Cir.), *reh'g en banc ordered*, 847 F.2d 1362 (1988) (*en banc*) (government suggested *en banc* rehearing on the basis that the record showed that Watkins had engaged in homosexual conduct).

*Population Services International,* [431 U.S.] at 688–689 [97 S.Ct. at 2017–2018]. 478 U.S. at 190, 106 S.Ct. at 2843–44. The Court distinguished homosexuality on the basis that it had "[n]o connection" with family, marriage or procreation, *id.* at 191, 106 S.Ct. at 2844, and rejected the notion that "any kind of private sexual conduct between consenting adults is constitutionally insulated." *Id.* The Court noted that *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), "twice asserted that the privacy right, which the *Griswold* line of cases found to be one of the protections provided by the Due Process Clause, did not reach so far." *Hardwick,* 478 U.S. at 191, 106 S.Ct. at 2844 (*citing Carey,* 431 U.S. at 688 n. 5, 694 n. 17, 97 S.Ct. at 2018 n. 5, 2021 n. 17).

The *Hardwick* Court stated that it is not "inclined to take a more expansive view of [its] authority to discover new fundamental rights imbedded in the Due Process Clause" and that "[t]here should be ... great resistance to expand the substantive reach of [that Clause], particularly if it requires redefining the category of rights deemed to be fundamental." *Hardwick,* 478 U.S. at 194–95, 106 S.Ct. at 2846. The Court therefore concluded that there was no fundamental right of homosexuals to engage in consensual sodomy and upheld the Georgia statute criminalizing sodomy.

■ The Court's admonition against taking an expansive view of authority to discover new fundamental rights imbedded in the due process clause counsels against an extension of privacy rights to homosexuality. *Hardwick,* 478 U.S. at 194–95, 106 S.Ct. at 2846. As stated in *Dronenburg,* "[i]f it is in any degree doubtful that the·

Supreme Court should freely create new constitutional rights, ... it is certain that the lower courts should not do so." 741 F.2d at 1396 (footnote omitted). Moreover, the Supreme Court cases dealing with protected privacy rights are essentially conclusions about the particular rights enunciated and cannot be readily applied in other factual contexts. *See Dronenburg v. Zech,* 741 F.2d 1388, 1396 (D.C.Cir.1984). Protection of homosexuality as a private right, therefore, is not an apparent or necessary result that can be reached from the Supreme Court's precedent. We must therefore reject Woodward's claim that homosexuality is constitutionally protected under the right of privacy.

### V

Woodward also argues that the Navy discriminated against him on the basis of his homosexuality, and that this violated his constitutional right to equal protection.[7] We find *Hardwick* equally persuasive, if not dispositive, of this argument as well.

Under equal protection analysis, the Supreme Court has fashioned a "two-tiered" approach to judicial review. Under this approach, the Court applies a "strict scrutiny" or "compelling reason" standard "only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–13, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (footnotes omitted).[8] Otherwise, discriminatory government action need only be justified upon a rational basis standard. *Id.* at 314, 96 S.Ct. at 2567.

---

7. The principles applicable to the states pursuant to the Fourteenth Amendment's equal protection clause are applied to the Federal Government as a component of the Fifth Amendment due process clause. *Beller v. Middendorf,* 632 F.2d 788, 801 n. 8 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981) and 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed. 2d 150 (1981); *see Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975) ("Fifth Amendment equal protection claims ... precisely the same as

equal protection claims under the Fourteenth Amendment."); *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

8. Because the Supreme Court held in *Bowers v. Hardwick* that there exists no fundamental right to engage in homosexual conduct, we need not further consider Woodward's claims from that standpoint.

■ The Supreme Court has identified only three suspect classes: racial status, *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), *Strauder v. West Virginia*, 100 U.S. 303, 307–08, 25 L.Ed. 664 (1879); national ancestry and ethnic origin, *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944), *Strauder v. West Virginia*, 100 U.S. at 307–08; and alienage, *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). Two other classifications have been identified by the Court as quasi-suspect: [9] gender, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723–24, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982), and illegitimacy, *Lalli v. Lalli*, 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978). Woodward would have this court add homosexuality to that list. This we decline to do.

Homosexuality, as a definitive trait, differs fundamentally from those defining any of the recognized suspect or quasi-suspect classes. Members of recognized suspect or quasi-suspect classes, e.g., blacks or women, exhibit immutable characteristics, whereas homosexuality is primarily behavioral in nature. *See Bowen v. Gilliard*, 483 U.S. 587, 602, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987) ("The disadvantaged class is ... not ... 'suspect' or 'quasi-suspect' ... they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group" (quoting *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986))); *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). The conduct or behavior of the members of a recognized suspect or quasi-suspect class has no relevance to the identification of those groups.

After *Hardwick* it cannot logically be asserted that discrimination against homosexuals is constitutionally infirm. We agree with the court in *Padula v. Webster* that "there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." 822 F.2d 97, 103 (D.C.Cir.1987).[10]

Accordingly, we conclude that Woodward is not a member of a class to which heightened scrutiny must be afforded nor that the Navy must have a compelling interest to justify discrimination against Woodward because of his admitted homosexuality.

## VI

The Navy's challenged practice regarding homosexuals need only be rationally related to a permissible governmental end to pass constitutional muster. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441–42, 105 S.Ct. 3249, 3255–56, 87 L.Ed.2d 313 (1985). Although this issue was not specifically argued by Woodward, we assume it to be inherent in his claim to be a member of a suspect class entitled to heightened scrutiny.

■ We are convinced that the Navy's policy on homosexuality is rationally related to a permissible end. *See Dronenburg v. Zech*, 741 F.2d at 1397–98; *Beller v. Middendorf*, 632 F.2d at 811–12. As stated in *Dronenburg*:

The Navy's policy requiring discharge of those who engage in homosexual conduct serves legitimate state interests which include the maintenance of "discipline, good order and morale[,] ... mutual trust and confidence among service members, ... insur[ing] the integrity of the system of rank and command, ... recruit[ing] and retain[ing] members of

---

**9.** The standard applied to a "quasi-suspect" class is that the classification "must serve important government objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976).

**10.** Sodomy, an act criminalized by a Georgia state statute which was found to pass Constitutional muster in *Hardwick*, 478 U.S. at 196, 106 S.Ct. at 2846, is usually defined broadly in the relevant state criminal statutes to include "any sexual act involving the sex organs of one person and the mouth or anus of another." *See, e.g., id.* at 188 n. 1, 106 S.Ct. at 2842 n. 1. These practices are the most common sexual practices of homosexuals, with oral sex being the primary form of homosexual activity. *See* A. Bell & M. Weinberg, *Homosexualities* 106–11, 327–30 (1978).

the naval service ... and ... prevent[ing] breaches of security." SEC/NAV 1900.9D (Mar. 12, 1981). We believe that the policy requiring discharge for homosexual conduct is a rational means of achieving those legitimate interests. *See Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir.[1980]), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 [1981]. The unique needs of the military, "a specialized society separate from civilian society," *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), justify the Navy's determination that homosexual conduct impairs its capacity to carry out its mission.

741 F.2d at 1398 (appendix citation omitted).

Special deference must be given by a court to the military when adjudicating matters involving their decisions on discipline, morale, composition and the like, and a court should not substitute its views for the "considered professional judgment" of the military. *Goldman v. Weinberger*, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed. 2d 478 (1986); *Rostker v. Goldberg*, 453 U.S. 57, 65–66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981); *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). In *Beller v. Middendorf*, Judge, now Justice, Kennedy said that "constitutional rights must be viewed in the light of the special circumstances and needs of the armed forces." 632 F.2d at 810. We think this is particularly true where, as here, the Secretary was given extremely broad discretion by Congress to release a reserve officer from active duty at any time, and the applicable regulations do not in any way limit that discretion. *See* 10 U.S.C. § 681(a) (1982); SECNAVINST 1920.6 (July 14, 1971); SECNAVINST 1900.9A (July 31, 1972).

We therefore affirm the judgment of the Claims Court on different grounds for the reasons set forth above.

AFFIRMED