Loren Stephen **LOOMIS**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 03–1653C.

United States Court of Federal Claims.

Nov. 7, 2005.

David P. Sheldon, Washington, D.C., for plaintiff. Philip Sundel, and Raymond J. Toney, Washington, D.C., of counsel.

Paul G. Freeborne, U.S. Department of Justice, Civil Division, Federal Programs Branch, for defendant. With him on the briefs were Peter Keisler, Assistant Attorney General, Vincent M. Garvey, Deputy Branch Director, and Major Susan J. Burger, U.S. Army Litigation Division, of counsel.

*OPINION*

BRUGGINK, Judge.

Pending in this military pay case are the parties' cross-motions for judgment upon the administrative record. Plaintiff's motion asks the court to review two decisions of the Army Board for the Correction of Military Records ("ABCMR"). The first ABCMR decision, issued in 2000, reviewed a prior Army Board of Inquiry ("BOI") decision which recommended that plaintiff be administratively separated due to homosexual conduct and conduct unbecoming an officer. Pursuant to the BOI decision, plaintiff was given a discharge "Under Other Than Honorable Conditions." The 2000 ABCMR decision reversed some of the findings of the BOI inquiry and, as a result, upgraded plaintiff's discharge to "General, Under Honorable Conditions." The second ABCMR decision, issued in 2004, denied plaintiff's request for an upward adjustment of his active federal service credit, which would have allowed him to retire with twenty years of active federal service.

Plaintiff asks the court to set aside the ABCMR decisions on the following grounds: he had a right to suspension of his BOI elimination proceedings, pending consideration of his retirement in lieu of elimination request; the Army improperly processed plaintiff's request for retirement in lieu of elimination; plaintiff presented substantial and sufficient evidence that he had accrued twenty years of active federal service credit at the date of separation; plaintiff's discharge should have been characterized as honorable; plaintiff did not receive a fair and impartial hearing before the BOI; the BOI unlawfully admitted and considered videotape evidence; the ABCMR erroneously found that the BOI considered all retention factors; the Army's criminal punishment of sodomy is unconstitutional; and the Army's "Don't Ask, Don't Tell" policy violates due process and equal protection under the Fifth Amendment of the Constitution.

Defendant makes the following responses: plaintiff had no right to have his elimination proceedings suspended pending consideration of his retirement application, and, even if he did, the error was harmless; plaintiff's request for retirement in lieu of elimination

was properly processed and denied; ABCMR's decision characterizing plaintiff's discharge as less than honorable is non-justiciable; plaintiff received a fair and impartial hearing; plaintiff had no legal right to exclusion of the videotape; plaintiff had no legal right to specific findings on the retention factors; notwithstanding the Army's "Don't Ask, Don't Tell" policy, plaintiff's discharge is amply and independently supported by ABCMR's finding of conduct unbecoming an officer; the Army's "Don't Ask, Don't Tell" policy is not unconstitutional.

The issues have been fully briefed. Oral argument was held on September 7, 2005. For the reasons set out below, we conclude that plaintiff had a right to suspension of his elimination proceedings while his request for retirement in lieu of elimination was being processed; that plaintiff's procedural and constitutional rights were not violated in either the discharge hearing or in the characterization of his discharge; that ample evidence exists to support the finding of conduct unbecoming and that plaintiff had violated the "Don't Ask, Don't Tell" policy; and that the Army's "Don't Ask, Don't Tell" policy is not unconstitutional. We remand the matter to the Secretary of the Army for further action consistent with this opinion.

BACKGROUND

Plaintiff was formerly a Lieutenant Colonel ("LTC") in the U.S. Army. Plaintiff joined the Regular Army in 1967 and was commissioned in 1969. He then served in the Army Reserve on active duty, during which time he completed a tour in Vietnam. He was awarded the Purple Heart and the Bronze Star Medal and was released from active duty in 1972. He continued serving in the Army Reserve not on active duty until he voluntarily returned to active guard/reserve status in 1983. Plaintiff remained on active guard/reserve status until the Army initiated involuntary elimination proceedings against plaintiff on August 19, 1996, based on homosexual conduct and conduct unbecoming an officer. What follows is a summary of the relevant, uncontested facts.

On August 2, 1996, plaintiff's home was intentionally set on fire. A witness gave the local police a description of a suspicious vehicle seen in the area near plaintiff's home at the time of the fire. Military police at the Fort Hood Military Reservation stopped a vehicle matching the description. The driver of the vehicle was identified as a 19–year–old Private First Class ("PFC") stationed on base. The PFC initially denied any involvement in setting the fire. Based on a number of inconsistencies not relevant here, however, the local police continued to investigate the PFC as a suspect. Because the arson involved Army personnel, the Criminal Investigation Command ("CID") also began investigating.

On August 9, 1996, according to CID Agent Meyer's report, dated the same day, the PFC later recanted his earlier statements and admitted to breaking into plaintiff's home and setting the fire. The PFC signed a statement declaring that he set the fire in order to destroy pictures and video of himself, taken by plaintiff, showing him naked in various poses. He claimed that he met plaintiff on base while walking back to his barracks from a movie sometime in March 1995. Plaintiff offered to drive him to the barracks and the soldier accepted. Before arriving at the barracks, however, plaintiff offered to first stop at his home off base to show the PFC his amateur photography collection. The PFC accepted. At some point after arriving, plaintiff began taking pictures and video of the PFC, first fully clothed, then unclothed in various poses. Eventually, the plaintiff took the PFC back to the barracks. The PFC claims that only then did he realize the gravity of what had happened and begin to fear what plaintiff would do with the photos and videotape. The PFC subsequently received two letters from plaintiff to which he did not respond.

In September 1995, the PFC met plaintiff again at plaintiff's home, allegedly in an attempt to gain access to remove the photographs and video. The PFC's statement represents that this was the first time he learned that plaintiff was an LTC in the military. The PFC alleged that sexual contact between himself and plaintiff took place during this second meeting. He claims that he allowed the sexual contact to occur out of fear of what plaintiff would do with the photographs. Afterwards, plaintiff drove the PFC back to his barracks.

The PFC stated that he continued to despair over the photos and video. He returned to plaintiff's home on the night of August 2, 1996, and broke in, seeking to retrieve the pictures. After being unable to locate them, he set fire to plaintiff's home in an attempt to destroy them.

Local officials also investigated the fire. The local fire marshal, after responding to the fire at plaintiff's home, collected a videotape from plaintiff's video camera on the chance that it contained evidence of the arsonist's identity. After reviewing the tape, however, he determined that it did not contain images of the arsonist. It showed plaintiff engaged in homosexual acts with two men who appeared to be soldiers. The tape was later given to CID agents.[1]

As a result of the enlisted soldier's statements and the videotape, elimination proceedings were initiated against plaintiff on August 19, 1996. On December 16, 1996, a BOI hearing took place. The BOI recommended that plaintiff be discharged for homosexual conduct and conduct unbecoming an officer. The BOI also recommended that plaintiff's discharge be characterized as Under Other Than Honorable Conditions ("UOTHC") based on a finding that plaintiff's homosexual acts involved "force, coercion, or intimidation," an aggravating factor under Army regulations. *See* Army Regulation ("AR") 600–8–24, para. 4–22h(1). The BOI decision was forwarded to a Board of Review ("BOR") which approved the BOI's recommendation on June 16, 1997. On July 14, 1997, plaintiff was discharged from the Army UOTHC.

Army regulations allow a soldier to request retirement once elimination proceedings are commenced. AR 600–8–24, para. 4–24.

---

**1.** This videotape is apparently a second videotape, unrelated to the videotape on which plaintiff's first encounter with the PFC was recorded.

Such a request must be properly styled, however, as one for "retirement in lieu of elimination." During the elimination proceedings, plaintiff requested retirement in various forms. Plaintiff requested an early retirement in lieu of separation around the same time elimination proceedings were initiated. This type of retirement allows soldiers to retire with less than 20 years of active service credit. It was denied, as there was no early retirement program for officers on active guard/reserve status and plaintiff had a pending adverse action. On January 14, 1997, plaintiff requested a voluntary retirement. This request was returned without action, again because the pending elimination proceedings rendered plaintiff ineligible. Plaintiff requested retirement in lieu of elimination on May 12, 1997, with an effective date of July 23, 1997. This request was denied 30 days later by the chief of the Army Reserve on June 12, 1997.

After his discharge, plaintiff appealed his elimination to the ABCMR. His appeal was filed on May 14, 1999. On September 20, 2000, at ABCMR's recommendation, the Secretary of the Army upheld plaintiff's elimination. The board reasoned:

> While [the PFC] may not have been his subordinate within the meaning of AR 600–20, the [plaintiff] was a senior commissioned officer and a leader and [the PFC] was a junior soldier.... [E]ven if the relationship had been heterosexual, the acts and military status of the participants would have constituted sufficient misconduct to justify elimination.

Admin. Rec. 76. Nevertheless, the board upgraded plaintiff's discharge to General, Under Honorable Conditions, because the record lacked any of the aggravating factors necessary to justify a discharge UOTHC. As a result, the Army directed that plaintiff be transferred to the Retired Reserve, making him eligible for a reserve retirement at age 60.

Plaintiff had also challenged the Army's denial of regular retirement benefits. The ABCMR upheld that denial, finding that the there was no provision for early retirement of active guard/reserve members at that time and that, in any event, the pending elimina-

tion proceedings would have rendered him ineligible. Likewise, the board decided that the Army properly denied plaintiff's January 1997 request for voluntary retirement because the pending elimination proceedings rendered him ineligible.

The board also upheld the Army's decision to deny plaintiff's May 1997 request for retirement in lieu of elimination. It concluded that plaintiff had not acquired 20 years of credible active duty service at the time of his request. Though plaintiff argued that Army regulations required a 30–day suspension of his elimination proceedings until a decision was reached on the request for retirement, the board held that the relevant regulations could not be used to allow plaintiff to accrue additional active duty service credit and, in any event, that any error was harmless.

Plaintiff filed a second ABCMR appeal on May 23, 2003, requesting 11 days of active service credit which, he claimed, would have made him eligible for a regular retirement prior to his separation from the Army. The board denied his request. The board noted that plaintiff's last official Statement of Service (DA Form 1506) enjoyed a presumption of regularity and evidenced that plaintiff had completed 19 years, 11 months, and 25 days of active military service. It found that an independent review of his military records likely would have resulted in less active service credit. It therefore concluded that the documents presented by plaintiff were not sufficient to demonstrate that he was entitled to more days of active service credit. It doubted, however, that any accurate adjustment of his active service could be obtained from the record of his service over the past 25 years. It therefore left the calculation in plaintiff's DA Form 1506 intact.

## DISCUSSION

The Tucker Act, 28 U.S.C. § 1491 (2000), authorizes certain actions for monetary claims in the Court of Federal Claims. *Martinez v. United States,* 333 F.3d 1295, 1302 (Fed.Cir.2003). To bring such a claim, however, a plaintiff must identify an appropriate "money-mandating statute" which provides a basis for the claim. *Id.* at 1303. In military discharge cases, the applicable stat-

ute is the Military Pay Act, 37 U.S.C. § 307 (2000). *See also Martinez,* 333 F.3d at 1302. As the plaintiff alleges that he was unlawfully discharged and is entitled to pay that he would have received but for the unlawful discharge, we have jurisdiction. *See id.* Although the court does not have general equity jurisdiction, the Tucker Act also provides that, in cases based on actions for monetary relief, the court may issue such orders as are necessary "[t]o provide an entire remedy and to complete the relief afforded by the judgment," including "as an incident of and collateral to any such judgment, ... orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2); *see also Martinez,* 333 F.3d at 1302.

When reviewing a military pay case under RCFC 56.1, our review is necessarily limited to the record before the agency. *Rebosky v. United States,* 60 Fed.Cl. 305, 310 (2004). Nor may we substitute our judgment for that of the agency. *Id.* at 311. Rather, we are bound by the agency's decision unless the plaintiff can demonstrate that "the [agency] acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence." *Id.* (citing *Dodson v. United States,* 988 F.2d 1199, 1204–05 (Fed.Cir.1993)).

Though this deferential standard seems similar to a review of the decisions of administrative agencies, it is not. In *Fisher v. United States,* 402 F.3d 1167 (Fed.Cir.2005), the Federal Circuit drew a distinction between cases that implicate who should serve in the military and cases which merely implicate the denial of benefits. In cases that challenge the military's determination of who should serve (and in what capacity), courts are limited to the standard of review set forth in *Adkins v. United States,* 68 F.3d 1317 (Fed.Cir.1995). The Federal Circuit in *Adkins* held that courts may not address the merits of such a decision, but may only examine whether the decision was made in a proper procedural manner. *Id.* at 1323; *see also Fisher,* 402 F.3d at 1180. In cases merely implicating the denial of benefits, such as disability or retirement benefits, the Federal

Circuit explained that a broader standard of review, similar to that applied to other administrative agency decisions, is appropriate, allowing the court to examine the merits of an agency's decision. In either case, the standard of review is deferential; " 'judges are not given the task of running the Army.' " *Fisher,* 402 F.3d at 1182 (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953)).

### A. Regular Retirement

Plaintiff argues that the elimination proceedings should have been suspended when he requested retirement in lieu of elimination. Plaintiff points to AR 600–8–24, Section VI, para. 4–24a, which states, "An officer identified for elimination may, at any time during or prior to the final action in an elimination case, elect one of the following options ... (3) Apply for retirement in lieu of elimination if otherwise eligible." Further, paragraph 4–24b provides that "when an option is elected, elimination proceedings will be suspended pending final action on the option elected by the officer." Plaintiff claims that if elimination proceedings had been suspended as required, he would have been on active duty for an additional 30 days, making him eligible for regular retirement.

According to the ABCMR, the "intent behind suspending board proceedings until a request for retirement is acted upon is to save the Army time and money (there being no sense to continuing board proceedings if the government approves the request for retirement)." Admin. Rec. 77. The Board noted that suspension was not required by statute and found that any error was harmless because even if a 30–day delay had been granted, the Army still could have eliminated plaintiff before he accrued 20 years. In addition, it concluded that plaintiff had not yet accrued 20 years of active federal service at the time he submitted his request. Defendant argues that the Army's decision that the regulation was inapplicable should be upheld.

■ It is well established that the military must comply with its own regulations, even if those regulations are not required by statute. *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993) (citing *Sargisson v. United*

*States,* 913 F.2d 918 (Fed.Cir.1990)). The regulation at issue plainly directs that elimination proceedings be suspended once an officer applies for retirement in lieu of elimination. The use of the word "will" indicates an absolute and leaves the Army no discretion to determine whether elimination proceedings should be suspended. It was therefore improper to disregard the mandate of the regulation, unless the regulation itself was not applicable. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) ("In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight *unless it is plainly erroneous or inconsistent with the regulation.*'" (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)) (emphasis added)).

■ The regulation provides that a service member may apply for retirement in lieu of elimination "if otherwise eligible." The ABCMR's decision, although not completely clear, apparently upheld the military's decision not to suspend the elimination proceedings on the ground that plaintiff was not "otherwise eligible" for retirement at the time he made his request. We disagree. The fact that plaintiff had not accrued 20 years of active service credit at the time he made his request for retirement should not have affected whether the elimination proceedings were suspended. The eligibility limitation speaks to whether the service member's request for retirement will be granted, not whether the elimination proceedings themselves must be suspended. We view the phrase as a clarification that facing elimination does not make one eligible for retirement. If the "otherwise eligible" language was read as a threshold requirement, a service member would be unable to request retirement in lieu of elimination unless he or she first proved eligibility. Such an interpretation puts the cart before the horse. The suspension mandate makes no reference to eligibility. Presumably, such a limitation is absent because in close cases such as the one here—where a service member is within days of accruing 20 years of active service credit—it is impossible to determine whether the service member is eligible for retirement unless the request is fully processed and a final determination is made. The eligibility determination and suspension operate independently.

Defendant counters that the suspension requirement was never meant to allow a service member who had not accrued enough active service credit at the time of his request to accrue enough days to retire. It cites no authority for its position. Even assuming this is correct, the Army is not free to disregard its own regulations. It is worth noting, moreover, that, while the suspension requirement was likely not for the purpose of allowing service members to accrue further active service credit, the Army recognized that such a consequence might result. The notice given to service members who are selected for elimination proceedings states:

> In accordance with AR 600–8–24 paragraph 4–11, you may—
>
> . . . .
>
> c. Apply for retirement in lieu of elimination if otherwise eligible, according to AR 600–8–24, chapters 4 and 6. The effective date for retirement will be *(as applicable, if you have at least 19 years and 6 months of AFS* [2] *but less than 20 years AFS, the effective date will not be later than 60 days from the date you attain 20 years AFS. If you have 20 or more years AFS, the effective date will be no later than 60 days from the date you elect retirement in lieu of elimination).*

AR 600–8–24 figure 4–3 (emphasis original). The Army itself plainly envisioned a scenario under which a service member who requests retirement in lieu of elimination might have less than 20 years active service credit, but would accrue such credit while the retirement request was being processed.

■ We also disagree with the board's decision that this error was harmless. The record shows that it took 64 days from the date plaintiff submitted his request for re-

---

2. Active Federal Service. We note that the clause refers specifically to a request for retirement in lieu of elimination. It does not refer to

early retirement, which ABCMR held that plaintiff would have been plainly ineligible for due to his being flagged for adverse action.

tirement in lieu of elimination to complete the elimination proceedings and discharge him (from May 12 through July 14). Contemporaneously, it took 30 days to process plaintiff's retirement request (from May 12 through June 12). The date that plaintiff would have acquired 20 years of active service credit was July 22. Though its opinion is less than clear, the board apparently reasoned that, if the elimination proceedings had been suspended, the work completed during the 64 days above could have been completed within the 39 days from June 12 through July 22, after a 30–day suspension for considering and rejecting the retirement request. We find no support in the record for such a conclusion.

The best measure of the relevant time periods is the actual time taken. There is no basis for assuming that elimination proceedings would have been completed more quickly if the proceedings had been suspended. What is much more likely is that plaintiff would have been discharged 30 days later than he actually was. Had the proceedings been suspended, plaintiff would have been on active duty an additional 30 days.

Consequently, if the Army had suspended the elimination proceedings while it processed his request for retirement in lieu of elimination, plaintiff would have accumulated enough active service credit to qualify for a regular retirement. The ABCMR's 2004 decision concluded that plaintiff had obtained 19 years, 11 months, and 25 days of active service credit at the time of his discharge. Had the elimination proceedings been suspended as required by regulation, plaintiff would have been discharged at least five service days beyond July 14, 1997, the actual date of his discharge. This would have resulted in his accruing the necessary additional days of active service credit. He, therefore, would have been eligible for a regular retirement with over 20 years of active service credit.

We need not address in any detail plaintiff's allegation that his request for retirement in lieu of elimination was improperly processed. Neither do we need to address plaintiff's challenge to ABCMR's second decision declining to credit plaintiff with eleven days of additional service credit. It is sufficient to note that the board found, and we have no reason to disagree, that it would be impossible to make an accurate adjustment of plaintiff's service record over 20 years after the alleged active service took place based on the evidence offered by plaintiff. This determination was due to the poor condition of plaintiff's service records. Plaintiff was charged with knowledge of, and on several occasions did challenge, the government's computation of his military service upon receiving periodic statements of his active service. The appropriate time to challenge the government's computation was then.

## B. Plaintiff's Discharge

Plaintiff challenges the regulations providing for his discharge, the characterization of his discharge, and also claims that the elimination proceedings violated due process requirements. He argues that his discharge should have been characterized as honorable; that he did not receive a fair and impartial hearing before the BOI; that the BOI unlawfully admitted and considered videotape evidence; that the ABCMR erroneously found that the BOI considered all retention factors; that the Army's punishment of sodomy is unconstitutional; and that the Army's "Don't Ask, Don't Tell" policy violates due process and equal protection. We discuss each assertion in turn below.

### 1. Characterization of Plaintiff's Discharge

Plaintiff asks the court to review the ABCMR's decision that plaintiff's service was less than totally honorable. As discussed above, plaintiff was originally discharged UOTHC based on the BOI's finding of force, coercion, or intimidation in conjunction with homosexual acts and conduct unbecoming an officer. The ABCMR, however, reviewed the evidence before the BOI and found that, while there was evidence of misconduct, there was insufficient evidence to support the finding of force, coercion, or intimidation. Accordingly, it upgraded plaintiff's discharge to General, Under Honorable Conditions.

Plaintiff seeks an upgrade of his discharge to Honorable.

Defendant responds that the matter is nonjusticiable. To the extent that plaintiff asks the court to substitute its judgment for that of the ABCMR, we agree. There are simply no "tests or standards" by which to compare ABCMR's decision on the merits, except for regulations which limit the military's discretion in such matters. *See Adkins,* 68 F.3d at 1323. Plaintiff was found to have engaged in homosexual conduct and conduct unbecoming an officer. Both of these findings fall within the category of "[m]isconduct." See AR 600–8–24, 4–2b. Finding misconduct, the ABCMR was well within its discretion to characterize plaintiff's discharge as less than honorable. The only relevant limitation in the regulation is that "[a]n officer may receive a discharge Under Other Than Honorable Conditions when there is a finding that during the current term of service, the officer attempted, solicited, or committed a homosexual act ... [b]y using force, coercion, or intimidation." AR 600–8–24, 4–22h (1). If the ABCMR had found that no force, coercion, or intimidation was involved in the homosexual acts but had upheld the characterization of plaintiff's service, there would clearly be a standard by which to judge the board's decision. However, the board upgraded plaintiff's discharge to General, Under Honorable Conditions. We cannot substitute our judgment for that of the military.

Accordingly, to set aside the ABCMR's characterization of plaintiff's service, plaintiff would have to show that the BOI's finding of misconduct was in error. He would have to show that there was some procedural error in the elimination proceedings, that the BOI's findings of homosexual conduct and conduct unbecoming an officer were unsupported by substantial evidence, that he was denied due process, or that the regulations themselves were unconstitutional. Plaintiff's arguments regarding such matters are discussed below.

### 2. Fair and Impartial Hearing

█ Plaintiff claims that he was denied an impartial hearing because the Legal Advisor allowed three BOI members to participate in his elimination hearing despite statements during voir dire that they personally disagreed with homosexual conduct and felt that homosexuals should be eliminated from the military:

[Plaintiff's Counsel]: How do feel about homosexuals in general?

[President of the Board]: I don't believe in homosexual conduct. I think homosexual conduct is immoral, therefore, I think homosexuals are immoral.

[Member Graham]: My feelings about homosexuals has varied over the years. When I was younger I thought it was an abhorrence against society and mankind. As I have matured, I feel that they have either a physiological or psychological problem as a deviant from society.

[Member Sasser]: My religious beliefs are against homosexuality. I'm a Methodist.

Admin. Rec. 185.

[Plaintiff's Counsel]: .... If the choice were yours, what would the Army's policy be on homosexuals in the Army.

[President of the Board]: If the choice were mine, it would be the old policy, no tolerance.

[Member Graham]: If I were king for a day my policy on homosexuals in the military forces would be that it is a [detriment] to the military and not to be allowed. Displayed behavior should not be allowed. If you have a homosexual persuasion and you don't display behavior, then how does anyone know you're a homosexual unless you acknowledge it.

[Member Sasser]: No tolerance.

Admin. Rec. 186.

Plaintiff argues that these responses demonstrate an inherent unfairness in the panel's composition. Defendant responds that, as military officers, there is a presumption that the BOI members acted properly. It notes that the BOI members also made statements that they could set aside their personal beliefs and follow Army regulations:

[Plaintiff's Counsel]: What is your feeling about homosexuals in the Army?

[President of the Board]: I abide by the current policy, "Don't ask, Don't tell."

[Member Graham]: As a soldier, I am governed by the rules that our country sets forth on the behavior, I concur with those rules. . . .

[Member Sasser]: I concur with the current UCMJ [Uniform Code of Military Justice] and the actions that we're supposed to abide by. . . .

Admin. Rec. 185–86. Defendant also notes that all members stated that they could envision instances in which a soldier who was homosexual or engaged in homosexual conduct could be retained in the Army.

Both due process and Army regulations require that plaintiff be given a fair and impartial hearing. *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); AR 600–8–24, Section II, para. 4–6 ("The Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army."). There is a rebuttable presumption that military officials, such as officers serving on boards of inquiry, "discharge their duties correctly, lawfully, and in good faith." *Milas v. United States*, 42 Fed.Cl. 704, 719 (1999) (quoting *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979)). To show bias in an administrative proceeding, plaintiff must show "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Bieber v. Dep't of the Army*, 287 F.3d 1358, 1362 (Fed.Cir.2002) (citing *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Such bias may be shown where remarks during the course of trial "reveal an opinion that derives from an extrajudicial source." *Id.*

Plaintiff has not met his burden. Primarily, this is because the facts considered by the BOI members were uncontested. As noted above, plaintiff stipulated to the contents of the videotape depicting plaintiff committing homosexual acts. The only truly contested issue at the hearing was whether these acts involved "force, coercion, or intimidation," an aggravating factor which, if found to be present, required that the board recommend that plaintiff be discharged UOTHC. To the extent there were contested facts, they have

been resolved in plaintiff's favor. The ABCMR reversed the BOI's determination that force, coercion, or intimidation was present and upgraded plaintiff's discharge to General, Under Honorable Conditions. Nevertheless, the underlying uncontested facts still constitute misconduct under Army regulations sufficient to justify plaintiff's separation under a less than honorable characterization. Plaintiff has received all the relief to which he is entitled on this issue, therefore, it is moot.

### 3. Admissibility of Videotape Evidence

 Plaintiff also challenges the admission of a videotape containing images of plaintiff engaged in homosexual acts. He argues that the videotape was seized without a warrant in violation of the Fourth Amendment. Plaintiff argues that the exclusionary rule should have prohibited the tape from being admitted at trial because the tape was seized without a warrant.

The videotape was seized by a local fire marshal who was present at plaintiff's home to investigate the cause of the fire. The justification for seizing the videotape is contested by the parties. According to the government, the fire marshal took the tape in hope that it contained images of the arsonist. Plaintiff contests this, and argues that the fire marshal seized the tape in bad faith when he observed homosexual pornography in the same area as the videotape. This videotape was given to the CID, and was used at plaintiff's hearing as evidence of plaintiff's homosexual conduct.

Regardless of the fire marshal's actual justification for seizing the tape, the exclusionary rule does not apply to administrative hearings such as the BOI proceeding. *Kindred v. United States*, 41 Fed.Cl. 106, 114 (1998); *Martinez v. United States*, 26 Cl.Ct. 1471, 1476 (1992), *aff'd*, 11 F.3d 1069 (Fed. Cir.1993). Plaintiff argues that AR 15–6, para. 3–6(c)(7) makes the exclusionary rule applicable. However, this regulation is quite different, as it only applies to "[b]ad [f]aith unlawful searches" where "members of the Armed Forces acting in their official capacity . . . conduct or direct a search that they know is unlawful under the Fourth Amend-

ment." AR 15–6, para. 3–6(c)(7). Even assuming that the search and seizure were unlawful, which we do not decide, they were conducted by civilian law enforcement personnel and were not at the direction of the Army. The regulation, therefore, does not apply.

It is also worth noting that, even if the videotape were admitted in error, the plaintiff stipulated to its contents. Moreover, even if the videotape had been excluded, the written statements of the PFC constituted substantial evidence upon which the BOI could make its decision. Finally, to the extent that the videotape was inflammatory, any prejudicial effect was corrected by the ABCMR when it reversed the BOI's finding of aggravating factors. Plaintiff's elimination, in short, was based on substantial evidence irrespective of the videotape and admission, and any error was harmless.

4. Consideration of Retention Factors

■ Plaintiff also argues that the BOI erred by not considering and making specific findings of the relevant retention factors.[3] This issue was raised before the ABCMR, which ruled that the BOI did consider the appropriate retention factors, but found them lacking, as the evidence showed that plaintiff had a propensity to engage in homosexual acts. The government concurs with the ABCMR ruling and also argues that the BOI was not required to make specific findings regarding the retention factors unless the officer "clearly and specifically raises such circumstances." *Kindred*, 41 Fed.Cl. at 116 n. 8; AR 600–8–24, para. 4–22b(f).

The record does not indicate that plaintiff "clearly and specifically" raised before the BOI the issue of whether the retention factors were met. Therefore, the BOI was not required to make specific findings regarding

those factors. In any event, it is also clear that there was substantial evidence that plaintiff had a propensity to engage in homosexual acts, thus making any error harmless.

5. Constitutional Challenges Based on *Lawrence v. Texas*

■ Plaintiff challenges article 125 of the Uniform Code of Military Justice (UCMJ), the military's sodomy prohibition, on the grounds that criminal punishment for sodomy has been ruled unconstitutional by the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). While plaintiff was not charged under article 125, the elimination proceedings as well as the characterization of his discharge were based upon conduct prohibited by article 125. He also asks the court to strike down the Army's "Don't Ask Don't Tell" policy ("DADT") on the same grounds.

Defendant argues that we do not need to reach the constitutional arguments because it has met its burden of proving an independent basis for discharging plaintiff. It contends that both plaintiff's discharge and the characterization of his service are based upon a relationship that, even if heterosexual, would still be unacceptable under Army custom and thus would support the Board's finding of conduct unbecoming. Defendant also argues that the question of whether plaintiff's conduct, absent its homosexual content, was prohibited by Army custom is nonjusticiable. It further asserts that the mere fact that plaintiff solicited another to violate a federal statute, regardless of the content of that statute, supports the conduct unbecoming charge.

Before reaching the constitutional arguments, we must consider whether the ABCMR's determination that the alternative ground of conduct unbecoming an officer justified plaintiff's elimination, irrespective of

---

**3.** 10 U.S.C. § 654(b)(1) (2000), mirrored in AR 600–8–24, para. 4–22(b)(1) states that a member of the armed forces shall be separated for engaging in or attempting to engage in homosexual conduct unless the court finds all of the following five retention factors:

 (A) such conduct is a departure from the member's usual and customary behavior;
 (B) such conduct, under all the circumstances, is unlikely to recur;

 (C) such conduct was not accomplished by use of force, coercion, or intimidation;
 (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
 (E) the member does not have a propensity or intent to engage in homosexual acts.

the homosexual nature of the relationship. As to defendant's first and second argument, in its briefing and at oral argument, it could not point to Army case-law or Army regulations that would support its notion of Army custom. While we owe a great deal of deference to the Army's determination of its own custom, the matter is justiciable. We require some regulation or case law as proof of what that custom is before we will affirm that determination. We turn next to defendant's third argument.

In its 2000 decision, the ABCMR upheld the plaintiff's discharge for conduct unbecoming an officer because "[i]t was not within the standards of acceptable personal conduct for him to seduce a junior soldier into committing an act which was known by him to be illegal under the UCMJ. It was his responsibility to ensure such junior soldiers do not violate military discipline." Admin. Rec. at 76.

As the U.S. Court of Military Appeals stated in *U.S. v. Bilby*:

> We do not believe that it seriously can be doubted that a military officer's act of soliciting another person to violate a Federal statute is disgraceful and dishonorable conduct, *see Parker v. Levy*, 417 U.S. 733, 761, 94 S.Ct. 2547, 2564, 41 L.Ed.2d 439 (1974), without regard for the nature of the statute (that is, what it prohibits) or for the lawfulness of the statute (that is, whether it ultimately is upheld as constitutional).... Simply stated, it is unbecoming

for an officer to solicit someone to violate a Federal statute—period.

39 M.J. 467, 470 (1994).

The record is clear that plaintiff intentionally persuaded the PFC to breach the UCMJ and Army regulations regarding homosexual acts which could have subjected the PFC to criminal sanctions. Regardless of the constitutionality of such laws, plaintiff, as an officer in the military, was charged with ensuring military discipline and the well-being of junior soldiers. An officer is not free to encourage other service members to breach military laws and regulations.[4]

Moreover, it is worth noting that, unlike the appellee in *Parker v. Levy*, the Supreme Court case cited by *Bilby*, plaintiff's motives in soliciting the PFC are not arguably "noble" in any sense. 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). There, an Army captain publicly urged enlisted personnel to refuse to obey orders which might send them into combat in Vietnam. *Id.* at 736–37, 94 S.Ct. 2547. Here, plaintiff did not ask the PFC to engage in some form of civil disobedience, he simply sought to persuade him to commit homosexual acts. Even worse, a close examination of the facts shows that plaintiff did so by hiding his true intentions from the PFC and, when his true intentions became known and the PFC clearly became distraught, continued in this behavior.[5]

Plaintiff first approached the PFC by offering him a ride back to his barracks. Before arriving there, however, plaintiff steered

---

**4.** Plaintiff knew of the PFC's military status, as he picked up the junior enlisted soldier on base under the pretense of giving him a ride back to his barracks. The PFC's age, nineteen, should have made it obvious that he was a very junior enlisted soldier. Further, the PFC's written statements, introduced as evidence at trial, indicate that he and plaintiff discussed his military career during their first encounter.

**5.** These facts are from the PFC's written statements given to CID agents. They were introduced at the BOI hearing. Plaintiff stipulated to the sexual acts contained in them and did not attempt to rebut these statements by testifying. It is worth noting that after the hearing, however, he filed a letter with the BOR, dated January 14, 1997, challenging the PFC's characterization of these acts. Admin. Rec. at 330. Plaintiff,

along with arguing a number of legal errors, attempted to offer additional evidence at that time in an affidavit attached to the letter. *Id.* at 346. In this affidavit he states that he had three visits from the PFC, not two; that he had made it clear to the PFC during their first encounter that the photography was nude and that plaintiff was homosexual; and that the PFC was an active participant who dressed up and noticeably used cologne in the second visit. *Id.* Though the PFC had ample motive to color the events in a favorable light, plaintiff had the right to offer these statements at his hearing but did not. Further, even assuming that it would be proper for this court to consider his statements, plaintiff does not contest that these sexual acts occurred and that such acts violate federal regulations and statutes regarding the military.

the conversation towards photography and convinced the PFC to take a detour to plaintiff's home to see his amateur photography. During this visit, according to the PFC's written statements, plaintiff took nude photographs and video of the PFC under the pretense that they were artistic in nature and could be given to his girlfriend:

> He told me he was always on trips and taking pictures.... We continued to talk and then he asked me if I would let him take some photos of me ... and began telling me how he took photos of people and ... how he could combine the photos of people with scenes to make it look like a person was at a certain place. He began taking pictures of me fully clothed....Then he asked me to remove my shirt [T]hen he asked me if I minded removing all my clothing .... At first I hesitated and then he started explaining that he did it all the time and he presented it to me like he did it as a form of art or photography class type thing. Then he asked me if I had a girlfriend and told me that this would be a great way for me to give my girlfriend a picture of me nude.... He did it in such a way that I thought he was a professional photographer.... Then he told me that we could take a couple of athletic pictures .... He had me do different exercises.... The entire time while I was doing this and he was telling me what to do he continued a conversation with me and it seemed to me that he was trying to keep my mind off of what he was doing.... Before I knew it he had taken many photographs of me.

Admin. Rec. at 285–86.

Eventually, plaintiff's true motives became apparent. In the process of setting up various photographic poses, he touched the soldier's genitals. *Id.* at 286. After plaintiff took more pictures of the PFC in various "S & M" outfits and unsuccessfully offered the PFC a back massage, the PFC told plaintiff that he wanted to go home. The PFC noted his feelings during the ride back to his barracks:

> All I kept thinking about w[ ]ere the pictures and video he had taken of me.

He drove up to my barracks and then gave m[e] his telephone number and told me to call him if I wanted to eat dinner or something. He then asked me for my address again and I gave it to him. I thought if I went alon[g] with the things he asked of me there would be a chance that I could get the pictures and videos back from him.... When I got back to my barracks it really hit me about what had happened. I was terrified and I realized everything that had happen[ed] to me. I felt very much abused by LOOMIS and didn't know what to do or who to go to for help. I was scared to go to anyone for fear of what they may think of me or think that I was homosexual .... I was concerned about the photographs and the videos and what LOOMIS was going to do with them if he found out I wanted them back to destroy them. I felt very low and felt that he had taken advantage of me.

*Id.* at 287.

Plaintiff mailed letters to the PFC periodically after their encounter. The PFC never replied to these letters. However, almost a year later, the PFC contacted plaintiff by phone and offered to meet plaintiff a second time. He did not tell plaintiff why he had agreed to meet him, however. He apparently hoped to steal the photographs and video. He was not successful, however:

> I wanted to go back over to the house and try to find the pictures without him knowing about it. I felt if I could get back into his house I could get the photographs and video tape and destroy them.... He drove me to his house and we went into the house and we began talking about my leave and he asked me if I wanted a glass of wine. I told him that would be fine and he brought it to me in the living room. We began to talk and he told me that he had gone on a trip and had new photographs to show me.... I then told him I wanted to see his computer.... I remembered the last time I was at the house he had taken the rolls of film out of the camera and placed them in the video camera case. I knew if I walked into the area where the computer was located I could pass by the case and see if the film was

still in there.... [T]he film was gone. We went into the room where the computer was and he began showing things on the computer.... I saw an icon that said something like "Picture Show or Slide Show." I asked LOOMIS what program that was and he told me it was nothing, just something he was putting together. He then wanted to leave the room and go back into the living room. I tried to look around the room for any photos or videos but could not find any.... While I was in the room where the computer was located I saw a name plate that had LOOMIS' name and LTC rank on one side and a unit crest on the other. After I saw this I figured LOOMIS was a LTC in the Army. We went back into the living room and sat down on the couch. At this point I felt there was nothing I could do to ever get the photographs back. LOOMIS had the photographs and he was a LTC. If he ever decided to use the photos against me no one would ever believe me, a PFC against a LTC. I was very scared and was trying to think of what to do to get the photographs back. After we sat down LOOMIS asked if I wanted a massage. I did not want to get a massage from him, but at this point I felt there was nothing I could do but go along with what he wanted to prevent him [from] doing something with the photos. Nothing could be worse than doing something with the photos. Out of fear, I told him that [I] would allow him to give me a massage.

*Id.* at 288.

Their encounter eventually became much more serious and clearly violated the Army's regulations regarding homosexual acts. Plaintiff massaged and touched the soldier and eventually tried to achieve sexual penetration. Although there was no penetration, the balance of plaintiff's actions clearly violated the military's "Don't Ask Don't Tell" policy, codified at 10 U.S.C. § 654. This section provides for separation for any member of the military who: (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act;" (2) "stated that he or she is a homosexual or bisexual, ... unless ... the member has demonstrated that he or she is not a person who en-

gages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts;" (3) or has "married or attempted to marry a person known to be of the same biological sex." 10 U.S.C. § 654(b)(1), (2), (3). A homosexual act is "(A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)." 10 U.S.C. § 654(f)(3).

After this encounter, plaintiff drove the PFC back to his barracks in silence. The PFC had no direct contact with plaintiff after this encounter, though he tried:

> Since that night I have called LOOMIS twice. I called to try and make contact with him to get the photos and video. I even thought about going back to the house again just to get in and try to distract him and find the photos. I never wanted to go back to the house and allow him to do anything sexual to me again.... I didn't want to go back into the house and do that again because it did not get me anywhere further with the photos the second time. I even drove by his house once, but could not go in because I got too torn up over what had happen[ed] before and I could not allow that to happen again.

*Id.* at 289.

The PFC states that, ultimately, he was so afraid of directly confronting plaintiff that he broke into plaintiff's home and, after searching unsuccessfully, set it on fire in an attempt to destroy the photos and video. When asked to sum up how he felt about what had occurred between himself and plaintiff he stated, "I feel he has destroyed my life and I feel that he abused me. I also feel he manipulated me into this and did it for his own sexual pleasure." *Id.* at 291.

Though the PFC's statements show he did not know until their second meeting that plaintiff was a LTC, or even in the military, it is very likely that plaintiff knew, or should have known that, the PFC was a very young, junior enlisted soldier. In sum, plaintiff, a

senior officer, inappropriately sought a sexual relationship with a junior soldier. He attempted to persuade the junior soldier to engage in a course of conduct which clearly violated the UCMJ and other military regulations. Further, he used deception to mask his true intentions and continued his course of conduct despite the soldier's apparent discomfort with the relationship. According to *Bilby*, this itself is disgraceful and dishonorable conduct regardless of the constitutionality of the statute or regulation violated. These facts clearly support the finding that plaintiff's action constituted conduct unbecoming an officer. Nevertheless, even if that were insufficient, the present state of the law does not allow us to find that homosexual conduct in violation of Army regulations does not constitute conduct unbecoming.

#### a. Substantive Due Process

■ Plaintiff challenges both article 125 and DADT on substantive due process grounds. Plaintiff challenges DADT on equal protection grounds as well.

The due process clause of the United States Constitution states that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The liberty protected has been held to include substantive as well as procedural rights. *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Of these substantive rights, those that are deemed fundamental trigger a more stringent level of review, strict scrutiny, and those that are not fundamental we review using the rational basis standard.

Plaintiff argues that in *Lawrence,* the Supreme Court recognized a fundamental right to same-sex intimate conduct. This right, plaintiff contends, was infringed both by his discharge and the Board's characterization of his service as they were based upon his conduct prohibited by DADT and article 125. Defendant's response is that the Court in *Lawrence,* while recognizing a liberty interest sufficient to strike a sodomy statute under the rational basis standard, did not hold that homosexual sodomy was a fundamental right.

The Supreme Court in *Lawrence* struck a criminal prohibition on private, consensual sodomy between adults. *Lawrence,* 539 U.S. at 579, 123 S.Ct. 2472. While *Lawrence* did not state that private consensual sodomy is a fundamental right, courts' and commentators' interpretations vary as to whether the Court impliedly recognized such a right. *See Lofton v. Sec'y of the Dep't of Children & Family Servs.,* 358 F.3d 804, 816 (11th Cir.2004) (holding that *Lawrence* does not characterize sodomy as a fundamental right); Sarah Catherine Mowchan, Comment and Note: *A Supreme Court that Is "Willing to Start Down that Road": The Slippery Slope of Lawrence v. Texas,* 17 Regent U.L.Rev. 125, 144 (2004) ("Under *Lawrence,* homosexual sodomy has not been raised to a fundamental right."); Laurence Tribe, *Lawrence v. Texas: The Fundamental Right that Dare Not Speak Its Name,* 117 Harv. L.Rev. 1893 (2004) (arguing that *Lawrence* recognized sexual conduct as a fundamental right, although it never explicitly named it as such). The United States Court of Appeals for the Armed Forces stated in *United States v. Marcum* that "[i]n *Lawrence,* the Court did not expressly identify the liberty interest as a fundamental right. Therefore, we will not presume the existence of a fundamental right ... when the Supreme Court declined ... to expressly identify such a fundamental right." 60 M.J. 198, 205 (2004). Support for the notion that sodomy is a fundamental right can be found in the fact that the *Lawrence* Court linked the right to sodomy to other fundamental rights recognized as part of the scope of liberty protected by substantive due process. *Lawrence,* 539 U.S. at 564–66, 123 S.Ct. 2472; *see also Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Carey v. Population Servs. Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). On the other hand, the Court also under-

mined the inference that such a right is fundamental by searching for a legitimate state interest, as required by rational basis review, rather than applying the strict scrutiny invoked by fundamental rights. *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472 ("The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.").

The fact remains that the Court did not hold that sodomy is a fundamental right. Like the United States Court of Appeals for the Armed Forces in *Marcum*, we will not presume such a right exists where the Supreme Court has declined to do so explicitly. Furthermore, the United States Court of Appeals for the Federal Circuit held in *Woodward v. United States* that homosexual conduct is not a fundamental right. 871 F.2d 1068, 1074 (1989). While that case was decided before *Lawrence* and relied on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (overruled by *Lawrence*) for the assertion that heightened review does not apply to homosexual conduct, we still find it applicable. While *Lawrence* overruled *Bowers*, *Lawrence* used rational basis review, the same standard used in *Woodward* when evaluating the military's policy against homosexual conduct and, thus, *Woodward* still has value to our analysis. As binding precedent that sodomy is not a fundamental right that has not been expressly overruled, we are bound by it.

Because there is no fundamental right implicated, rational basis is the appropriate level of review. The United States Court of Appeals for the Armed Forces has developed an as-applied approach to challenges of article 125, and we choose to analyze DADT on its face. Accordingly, we will address the constitutionality of the two provisions separately.

Article 125 of the UCMJ criminalizes sodomy. Plaintiff argues that if we decline to recognize homosexual conduct as a fundamental right, article 125 still fails even ra-

tional basis review. Plaintiff contends that the Army's purposes for article 125 are to enforce morality and private biases, which he asserts are not legitimate state interests sufficient to uphold it. Furthermore, plaintiff points out that while *Lawrence* contains a list of situations to which it does not apply, the military is not on that list.[6]

Defendant's only response is that plaintiff lacks standing to challenge article 125 because he was not prosecuted under it. If article 125 is unconstitutional, the ABCMR has little upon which to base plaintiff's discharge and the characterization of his service. Thus, it is plainly necessary that we address the constitutionality of article 125 in order to uphold the charge of conduct unbecoming.

When article 125 was challenged based on *Lawrence* in the United States Court of Appeals for the Armed Forces, the court opted to address the constitutionality of article 125 using an as-applied approach, rather than through a facial challenge approach. In *Marcum*, the court held the following:

> This as-applied analysis requires consideration of three questions. First, was the conduct that the accused was found guilty of committing of a nature to bring it within the liberty interest identified by the Supreme Court? Second, did the conduct encompass any behavior or factors identified by the Supreme Court as outside the analysis in *Lawrence?* Third, are there additional factors relevant solely in the military environment that affect the nature and reach of the *Lawrence* liberty interest?

60 M.J. at 206–07 (citations omitted); *see also United States v. Stirewalt*, 60 M.J. 297 (2004). The Court in *Lawrence* found that certain conduct fell within a protected liberty interest. 539 U.S. at 578, 123 S.Ct. 2472. Next, it listed situations that were clearly not within its holding. *Id.* It then looked for a

---

6. The Court stated that "[t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public

conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472.

legitimate state interest for prohibiting this conduct in the civilian context. *Id.*

*Marcum* mirrors the *Lawrence* analysis in the military context. The first question of the *Marcum* test addresses whether the conduct in the military context falls within the liberty interest protected by *Lawrence*. The second *Marcum* question asks whether the particular conduct was specifically excepted from *Lawrence's* holding. The third question asks whether there is any reason unique to the military for prohibiting that conduct that would qualify as a legitimate state interest. The three questions posed by *Marcum* are an effective approach to challenges to article 125.

The first question, then, is whether plaintiff's conduct was of a nature to bring it within the liberty interest protected by *Lawrence*, namely, private consensual sodomy between adults. The conduct in question took place off base between adults in private. While the ABCMR found that there was no evidence of coercion, it is questionable whether the conduct was consensual. Assuming however that this conduct was within the liberty interest protected by *Lawrence*, we move onto the second question of whether the conduct was identified by the Court as outside its analysis. The Court in *Lawrence* specifically excepted from its holding, conduct involving "persons who might be injured or coerced or who are situated in relationships where consent might not be easily be refused." 539 U.S. at 578, 123 S.Ct. 2472. As the court in *Marcum* noted, when evaluating such situations, "the nuance of military life is significant." 60 M.J. at 207. The ABCMR found that there was no evidence of coercion. Plaintiff was significantly higher in rank than the PFC, however. The PFC might not have known during their first interaction that plaintiff was a lieutenant but he surely knew during their later interaction. The PFC's testimony demonstrates that he felt intimidated both by plaintiff's rank and by the fact that plaintiff already had incriminating photographs of him. We hold that the nature of the relationship between plaintiff and the PFC, while not directly within a chain of command, is such that consent might not easily be refused and thus it is outside of

the liberty interest protected by *Lawrence*. We do not need to reach the third question

In asking us to examine article 125 on its face rather than as-applied, plaintiff would have us ask the second *Marcum* question about the military as a whole rather than about this particular relationship. It is not necessary that "military" be specifically listed as excepted by *Lawrence* from its holding because we hold that this particular relationship was specifically excepted as one where consent might not easily be refused. Thus article 125, as applied to plaintiff, does not violate due process.

■ Plaintiff's arguments for why DADT violates substantive due process are largely the same as those offered with respect to article 125, namely that the purpose of the provision is to enforce morality or private bias. Defendant responds that, because homosexual sodomy is not a fundamental right, rational basis review is invoked under substantive due process. Defendant proffers three justifications for the policy: promoting unit cohesion, reducing sexual tension, and protecting privacy. Support for the link between DADT and these justifications, according to defendant can be found in the congressional findings upon which the policy is based. Those findings, set out in 10 U.S.C. § 654(a), include the following:

(6) Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion.

. . .

(8) Military life is fundamentally different from civilian life in that—. . . (B) the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.

. . .

(12) The worldwide deployment of United States military forces, the international responsibilities of the United States and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living condi-

tions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy.

Defendant also cites at length from the report of the Senate Armed Services Committee to support the link between the policy on homosexuality and the ends sought: promoting unit cohesion, reducing sexual tension, and protecting personal privacy. S.Rep. No. 112, 103rd Cong., 1st sess. 265–270 (1993) (hereinafter "Senate Report"). Defendant argues that, rather than discriminating based on sexual orientation, the current policy assumes that both heterosexual and homosexual members are likely to act in accordance with their sexual drives. However, given this assumption, the nature of the differences between homosexuals and heterosexuals requires that the military treat them differently. "The military is able to promote unit cohesion, reduce sexual tension, and protect personal privacy in the case of heterosexual servicemembers by providing separate quarters for men and women, such an accommodation is not available for those individuals who engage in homosexual conduct." Defendant's Reply Brief at 24.

Defendant also cites to *Woodward* as Federal Circuit precedent for the proposition that the military policy on homosexual conduct does not violate the due process clause. In that case, Woodward was released from active duty in the Navy based upon his statements professing homosexuality. The policy challenged was the Navy's policy in place before DADT. The court held that it was "rationally related to a permissible end." *Woodward*, 871 F.2d at 1076. The permissible ends identified by the court included maintenance of discipline, insuring the integrity of the system of rank and command, and mutual confidence among service members.

As discussed *supra*, DADT does not implicate a fundamental right and thus will be reviewed under the rational basis standard for substantive due process purposes. In order to survive rational basis review, for purposes of substantive due process, a law must be rationally related to a legitimate state purpose. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Reno v. Flores*, 507 U.S. 292, 305, 113 S.Ct.

1439, 123 L.Ed.2d 1 (1993). The burden is on the party challenging the provision to "'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller*, at 320–21, 113 S.Ct. 2637. Our review of statutes regarding military matters is especially deferential. *Goldman v. Weinberger*, 475 U.S. 503, 507–08, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (citing *Rostker v. Goldberg*, 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)) ("[Judicial] deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged."). Additionally "[t]he framers did not view the federal judiciary—appointed with life tenure—as the appropriate body to exercise military authority and therefore gave the judiciary 'no influence over either the sword or the purse.'" *Able v. United States*, 155 F.3d 628, 633 (1998) (quoting The Federalist No. 78, at 520 (Alexander Hamilton) (Heritage Press ed., 1945)).

The congressional findings contained in § 654(a) as well as the Senate Report shed meaningful light on DADT's purpose. General H. Norman Schwarzkopf testified to the committee "that unit cohesion 'is the single most important factor in a unit's ability to succeed on the battlefield.'" Senate Report at 274. Similarly, General Colin Powell testified that:

> [t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies. We cannot allow anything to happen which would disrupt that feeling of cohesion within the force.

*Id.* at 275. Certainly unit cohesion is a legitimate state interest.

Maintenance of unit cohesion comes, in part, from providing men and women with separate living quarters, as it reduces sexual tension. General Powell testified that unit "[c]ohesion is strengthened or weakened in the intimate living arrangements we force upon our people." *Id.* at 278. Because

members of the military "must live and work under close conditions affording minimal privacy" during deployment, the military personnel policy must reflect what is required under those conditions. *Id.* at 277. The committee points out that "[i]n civilian life people are not compelled to live with individuals who are sexually attracted to members of the same sex, and the committee finds no military necessity to compel persons to do so in the military." *Id.* at 281. Additionally, as defendant points out, reducing sexual tension and maintaining privacy for heterosexual servicemembers under deployment conditions can be achieved with same-sex living arrangements. The only way to maintain privacy and reduce sexual tension with homosexual service members would be to offer them separate individual living quarters-something that is clearly impossible under deployment conditions. DADT's prohibition on homosexual conduct and upon open discussion of one's homosexuality are a rational means to attain the end of reducing sexual tension and promoting unit cohesion.

The Senate Armed Services Committee further concluded that even if the Supreme Court were to reverse *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841-which in fact it later did in *Lawrence* "and hold that private consensual homosexual acts between adults may not be prosecuted in civilian society," its judgment on the matter would be no different. *Id.* at 287. Additionally, *Lawrence* can be distinguished on the basis that discharge proceedings under DADT are not criminal in nature. Unlike the petitioners in *Lawrence,* plaintiff was eliminated from the military—the military equivalent of being fired—pursuant to an administrative, rather than criminal proceeding. We are, in any event, bound by *Woodward,* a Federal Circuit decision upholding the military's former policy on due process grounds. We conclude that § 654 is rationally related to the end of achieving military success.

b. Equal Protection

The equal protection clause of the fourteenth amendment guarantees that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. amend IV § 1. The equal protection clause is applicable to the federal government through the due process clause of the fifth amendment. *United States v. Iron Shell,* 633 F.2d 77, 89 n. 17 (8th Cir.1980) (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Statutes drawing a classification are generally held to be valid if the classification is rationally related to a legitimate government interest. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Strict scrutiny is invoked by statutes that classify based on exercise of a fundamental right. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–13, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.").

Plaintiff argues that DADT fails rational basis review because the classification's only purpose is to enforce morality and private bias. His arguments for DADT's failure of rational basis review largely parallel those offered to support the proposition that DADT violates substantive due process, discussed *supra.* However plaintiff additionally argues that *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620 (1996), *City of Cleburne v. Cleburne Living Center,* and *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), are decisive in this matter in that they prohibit any laws that give effect to private bias.

Defendant's arguments largely mirror those offered in defense of the substantive due process challenge. Additionally, it contends that every circuit court to consider DADT in the equal protection context has held that it satisfies rational basis review. Defendant, again, cites to *Woodward* as controlling precedent that the military's policy on homosexual conduct is consistent with the equal protection clause.

Applying the rational basis standard, we conclude that the classification contained in DADT is rationally related to the government's interest in promoting unit cohesion

and reducing sexual tension and thus does not violate the equal protection clause. Every circuit court which has addressed the matter has held that DADT survives rational basis review when subjected to an equal protection challenge. *See Able v. United States,* 155 F.3d 628 (2d Cir.1998); *Holmes v. California Army Nat'l Guard,* 124 F.3d 1126 (9th Cir.1997); *Philips v. Perry,* 106 F.3d 1420 (9th Cir.1997); *Richenberg v. Perry,* 97 F.3d 256 (8th Cir.1996); *Thomasson v. Perry,* 80 F.3d 915 (4th Cir.1996). Plaintiff argues that these cases are not persuasive as they relied upon *Bowers* before it was overruled by *Lawrence.* We are not persuaded. Each of these cases applied rational basis review, the same standard used in *Lawrence,* and held that the classification was rationally related to the military's interest in promoting unit cohesion, reducing sexual tension, and protecting privacy.

We owe Congress a great deal of deference in matters concerning the military. While DADT draws a distinction between those who practice homosexual conduct and those that do not, we cannot say that this classification is not rationally related to a legitimate state interest.

*Palmore* and *Cleburne Living Center* are not to the contrary. In *Cleburne Living Center,* the Court invalidated a zoning ordinance that required a special use permit for group homes for the mentally retarded. 473 U.S. at 435, 105 S.Ct. 3249. The Court held that the statute was based on nothing more than private bias because the statute singled out the mentally retarded and there was no legitimate interest furthered by requiring a permit from this particular group but not other groups, such as fraternities and hospitals. *Id.* at 447–48, 105 S.Ct. 3249. Similarly, in *Palmore,* the Court held that the law cannot give effect to private biases. DADT does not give effect to private biases. Rather it seeks, in the most logical and least burdensome way possible, to ensure that sexual tension is minimized in order to promote the unit cohesion necessary for military success.

Plaintiff's reliance on *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855, is also misplaced. That case involved an amendment to the Colorado constitution, which prohibited the state of Colorado or any of its political subdivisions from enacting or enforcing any statute whereby one could claim discrimination or minority or protected status based on homosexual conduct. *Id.* at 624, 116 S.Ct. 1620. The Court, applying rational basis review, struck down the amendment because it imposed "a broad and undifferentiated disability on a single named group" and because "its sheer breadth [was] so discontinuous with the reasons offered for it that the amendment seem[ed] inexplicable by anything but animus toward the class it affect[ed]." *Id.* at 632, 116 S.Ct. 1620. DADT's effect is not so discontinuous from the goal of reducing sexual tension and promoting unit cohesion that it is inexplicable by anything but animus toward homosexuals. By contrast, here we have no basis for questioning Congress' stated view that DADT promotes unit cohesion, reduces sexual tension, and protects personal privacy—all things necessary for an effective military.

## CONCLUSION

For the reasons set out above, plaintiff's motion is granted with respect to his assertion that he had a right to suspension of his elimination proceedings before the BOI pending consideration of his request for retirement in lieu of elimination. In all other respects it is denied. Defendant's motion is denied with respect to plaintiff's right to have his elimination proceedings suspended, as explained above. In all other respects, defendant's motion for judgment on the record is granted.

The parties agree that it is appropriate to remand the matter to the Secretary of the Army for further proceedings consistent with this opinion. Accordingly,

(1) Pursuant to RCFC 56.2(a)(1) and 28 U.S.C. § 1491(a)(2), plaintiff's claim is hereby remanded to the Secretary of the Army, to have the opportunity to make the determinations detailed below.

(2) The Army shall, *inter alia,* address the following:

 (a) Make a grade determination as provided in Army Regulation 15–80; and,

(b) Make a determination regarding what monies plaintiff is entitled to with respect to his claim for back pay, allowances, and interest, if any.

(3) Defendant is directed to file a status report, on or before January 13, 2006, indicating the status of proceedings on remand, pursuant to RCFC 56.2(a)(5).

(4) The agency's determination on remand shall be filed by defendant no later than February 24, 2006.